IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs November 27, 2001

## STATE OF TENNESSEE v. FREDRICK DEVILL RICE

**Appeal from the Criminal Court for Hamilton County**
**No. 225992    Stephen M. Bevil, Judge**

---

**No. E2000-02389-CCA-R3-CD**
**June 17, 2002**

---

The defendant, Fredrick Devill Rice, was convicted by a Hamilton County Criminal Court jury of first degree premeditated murder and first degree felony murder. The trial court merged the two convictions and sentenced the defendant to life imprisonment. The defendant appeals, claiming that (1) the evidence is insufficient to support his merged convictions; (2) the trial court erred by admitting a videotaped search of the defendant's residence into evidence; and (3) the state argued outside of the record twice during closing argument. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ALAN E. GLENN, JJ., joined.

Mike A. Little, Chattanooga, Tennessee, for the appellant, Fredrick Devill Rice.

Paul G. Summers, Attorney General and Reporter; Angele M. Gregory, Assistant Attorney General; William H. Cox, III, District Attorney General; Christopher David Poole, Assistant District Attorney General; and Barry A. Steelman, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

This case relates to the murder of Anthony Wayne Sims. Debra Fuqua testified that on October 26, 1998, she was walking to a friend's house and saw the victim and the defendant near the intersection of Curtis and Sherman Streets in Chattanooga. She said that she knew the defendant as "Johnny Boy" and that she had purchased drugs from him in the past. She said that the victim and the defendant were standing behind a gray car and that the victim was showing the defendant something in a black cloth briefcase. She said that the two men were standing face-to-face and "having some words" when the defendant shot the victim in the head. She said that the victim fell from behind the car and that the defendant looked at her and said, "Bitch, you'll be next." She said

that when the police arrived, she did not tell them about what she had seen because she was afraid for her life. She said there was no doubt in her mind that the defendant shot the victim.

On cross-examination, Ms. Fuqua testified that the first thing she did after witnessing the shooting was open a bottle of beer that she had been carrying. She said that when Detective Frank Newsom arrived at the scene, she told him that she had not seen anything. She said that a couple of weeks later, she told Detective Newsom about witnessing the defendant shoot the victim. She acknowledged telling Detective Charles Dudley during an interview that just before the shooting, she saw the defendant and a Caucasian male "tussling" near the victim. She also acknowledged telling Detective Dudley that one of the men shot the victim but that she could not tell which one shot him. She acknowledged telling him that the shooter took the black briefcase out of the trunk of the car. Ms. Fuqua testified that after the shooting, the defendant and the Caucasian male left the scene in a second car. Later, Ms. Fuqua testified that the defendant left the scene with an African-American male and a Caucasian male. Ms. Fuqua acknowledged having a previous conviction for theft.

Ms. Fuqua denied owing the defendant money at the time of the shooting or asking Detective Newsom about a reward. Although she said that she had not smoked cocaine the day of or the day before the shooting, she acknowledged testifying at the preliminary hearing that she had smoked crack cocaine twelve to thirteen hours before the shooting. She denied telling different stories about the shooting.

Detective Frank Newsom of the Chattanooga Police Department testified that he saw Debra Fuqua on October 26, 1998, at the intersection of Curtis and Sherman Streets while he was investigating the victim's death. He said that Ms. Fuqua whispered to him that she needed to tell him something about the killing. He said that she was very nervous and that he told her that he would contact her later. He said that it took him two to three days to find Ms. Fuqua and that she still was frightened and did not want to talk to him. He said that Ms. Fuqua did not ask him about a reward and that he did not offer her a reward for information about the case.

Hubert Lacy, the victim's first cousin, testified that the victim came to his home the night before the victim was killed and wanted to show him a gun. He said that the victim took the gun out of a black nylon case. He said that the gun looked like a TEC-9 or some kind of automatic weapon. He said that the gun folded and fit into the black case. He said that before the victim left his home, the victim put the black case in the trunk of the victim's car.

Faith Sharon Morris testified that she knew the defendant by his street name, "Johnny Boy." She said that on the morning of the victim's murder, she was at the defendant's mother's house with the defendant. She said that about 6:00 a.m., the victim came to the house looking for drugs. She said that she, the defendant, and the victim smoked crack cocaine. She said that the victim told her that he was a Vietnam veteran and a former state trooper. She said that at some point, the victim said that he needed to find an automatic teller machine (ATM) in order to get more money. She said that he left the house with an unidentified female and that when he returned, he had a pistol with him.

She said that the victim took the ammunition clip out of the pistol and put the pistol in a drawer. She said that the victim went outside to his car and returned with a black cloth briefcase. She said that someone put the briefcase in the defendant's closet and that she did not think anyone took the briefcase back to the car. She said that the defendant went outside to the victim's car and that when he returned to the house, he told her the victim had more guns in the trunk. She said the defendant told her that he wanted one of the guns. She said that the victim and the defendant talked about trading a gun for crack cocaine.

Ms. Morris testified that she saw the defendant with a gun in his pants and that he told her that he was going to kill the victim. She said that she went to the defendant's sister's house and that about thirty to forty minutes later, the defendant came to his sister's home. She said the defendant washed his hands with Clorox and said, "I told you I was going to get it."

On cross-examination, Ms. Morris testified that when the defendant arrived at his sister's house, he was not carrying anything. She said the defendant looked like he was washing oil and grease off his hands. She also said she heard Debra Fuqua ask Detective Newsom about reward money.

Detective Charles Dudley of the Chattanooga Police Department testified that the police dispatcher notified him of a homicide and that he went to the intersection of Curtis and Sherman Streets about 1:30 p.m. He said the victim was lying fully clothed under the rear of a gray Subaru. He said that the car's engine was running and that the trunk and passenger door were open. He said that the victim had been shot in the head and that blood was pooling beneath the victim. He estimated that the victim had been killed about 1:00 p.m.

Detective Dudley testified that blood splatter on the trunk indicated that the victim had been shot as the victim was bending into the trunk. He said that the car and items inside of it were dusted for fingerprints. He said that only one identifiable print was recovered and that it belonged to the victim. He said the police found ammunition in the car but no guns. He said that at 7:00 p.m., he searched the victim's residence and found boxes of ammunition that were marked "Made in Russia." He said that he also found rifles, a shotgun, and a handgun.

Detective Dudley testified that after talking with Debra Fuqua on October 29, the defendant became a suspect. He said that he searched the defendant's mother's residence on October 30, 1998, and found a black nylon bag underneath a pile of clothes in the defendant's closet. He said that the bag contained a box of Russian ammunition. He said that he also found a .22 caliber rifle but that the murder weapon was never recovered. He said that based on what he had learned from Debra Fuqua and the search of the defendant's residence, he arrested the defendant on October 30, 1998.

On cross-examination, Detective Dudley testified that after the murder, several guns were missing from the victim's car but that none of the guns were found in the defendant's home. He acknowledged that Ms. Fuqua told him that she had seen an African-American man and a Caucasian man tussling near the victim and that she could not tell which man shot the victim. He said that Ms.

Fuqua also told him that before the shooting, she saw an African-American man and a Caucasian man in a separate car that was following the victim's Subaru.

Sergeant Brian Bergenback of the Chattanooga Police Department testified that he investigated the crime scene. He said that the victim's car was parked at the intersection of Curtis and Sherman streets and that the victim was lying near the rear of the car. He said that the victim was bleeding from a head wound and that he found blood splatter on the inside of the trunk and on the car's bumper. He said that after the victim's car was towed to the processing center, he found a gun holster and pistol magazine in the glove box.

Dr. Marilyn Gay Murr, Deputy Medical Examiner for Hamilton County, performed the victim's autopsy. She testified that the victim died of a gunshot wound to the head and that the manner of the victim's death was homicide. She said that the victim's blood contained cocaine, Prozac, and .09 percent alcohol. On cross-examination, she said that the location of the victim's head wound was inconsistent with Ms. Fuqua's testimony that the defendant and the victim were standing face-to-face when the defendant shot the victim. She estimated that the gun was fired more than two feet away from the victim.

Anthony Sims, Jr., the victim's son, testified that he last saw the victim alive about one week before the murder and that the victim was driving a 1993 silver Subaru. He said that the victim was a disabled veteran and a former highway patrolman. He said that the victim was an alcoholic and took Prozac for nightmares. He acknowledged that the victim was an avid hunter and gun collector and said that the victim owned at least ten rifles and a few pistols. He said the victim also owned crates of Russian ammunition. On cross-examination, he said that the victim often kept rifles in the victim's car and that after the murder, some of the victim's guns were missing.

Nathan Benford testified that he was a federal prisoner serving a life sentence for conspiracy to distribute crack cocaine. He said that about October 1998, he was being held in the Hamilton County Jail and shared a cell with the defendant. He said that the defendant told him the following: The victim drove a car full of guns to the defendant's house. The defendant wanted a gun that the victim kept in a black case. The defendant and the victim left in the victim's car and drove a few blocks. The defendant got out of the car and shot the victim in the head. The defendant got the guns out of the victim's car, ran around the corner, and got into a maroon Cadillac with two men inside. The defendant buried the murder weapon in the backyard.

Mr. Benford testified that the state had made no promises to him in return for his testimony in this case. He said, however, that the state was going to inform federal authorities about his cooperation, which could reduce his sentence. On cross-examination, he said that he was forty years old and had sold cocaine for ten years before he was convicted. He said that he was cooperating with the authorities in other cases in hopes that federal authorities would reduce his sentence.

The defense called Hazel Adams, who testified that she lived in a house at the corner of Curtis and Sherman Streets. She said that on October 26, 1998, she heard a gunshot between 12:30 and 1:00 p.m. She said that she did not see anyone in the street before hearing the gunshot.

Marvin Toney testified that he was returning to his Curtis Street home on October 26 and saw a car parked in front of his house. He said that an African-American man with plaited hair and a Caucasian man were inside the car. He said that he drove around the car and pulled into his driveway. He said that as he went into the backdoor of his home, he heard a gunshot. He said that when he went outside, he saw the Caucasian man lying on the ground but that he did not see the African-American man. The record reflects that when the police arrested the defendant, he did not have plaits in his hair.

Joe Penney testified that on October 26, he drove by a Caucasian man and an African-American man standing on Curtis Street. He said that the African-American man was standing at the back of a car and that the white man was standing near the car's passenger side. He said that the African-American man had plaits in his hair. He said that he drove to a gas station and that when he drove back by the scene, the police were present. On cross-examination, he acknowledged that he was not paying close attention to the two men. He could not say that the defendant was not the man he saw on October 26. The jury convicted the defendant.

## I. SUFFICIENCY OF THE EVIDENCE

The defendant claims that the evidence is insufficient to support the jury's finding that he committed first degree premeditated murder and first degree felony murder. Specifically, he claims that witnesses gave inconsistent testimony about the shooting and the location of the black gun case at the time of the murder. In addition, he claims that his appearance is different from descriptions given by two defense witnesses and that the state failed to offer any proof that he took guns from the victim's car. The state contends that the evidence is sufficient to convict the defendant. We agree with the state.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). We do not reweigh the evidence but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

First degree premeditated murder is defined as a "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). Further, "premeditation" is defined as

an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Tenn. Code Ann. § 39-13-202(d). The element of premeditation is a question for the jury and may be established by proof of the circumstances surrounding the killing. Bland, 958 S.W.2d at 660. Our supreme court has delineated the following factors that demonstrate the existence of premeditation: the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, and calmness immediately after the killing. Id. First degree felony murder is in pertinent part, a "killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery." Tenn. Code Ann. § 39-13-202(a)(2).

Viewed in the light most favorable to the state, we believe that the evidence is sufficient to support the defendant's convictions. The proof shows that the victim drove his silver Subaru to the defendant's house and that the victim had guns in the car. The defendant told Ms. Morris that he wanted one of the guns and that he was going to kill the victim. As the victim and the defendant were standing behind the Subaru, Ms. Fuqua saw the defendant shoot the victim in the head. This evidence is sufficient to support the defendant's conviction for premeditated murder. Moreover, the evidence shows that after killing the victim, the defendant took the victim's guns out of the Subaru and fled the scene. Thus, the evidence also is sufficient to support the defendant's felony murder conviction. Although the defendant claims that conflicting testimony rendered the evidence insufficient to support his convictions and that two defense witnesses described seeing the victim with an African-American man, who had hair that was different from the defendant's hair, we note that a "jury verdict approved by the trial judge accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the State's theory." State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). The evidence is sufficient to support the defendant's convictions for first degree premeditated and felony murder.

## II. VIDEOTAPE EVIDENCE

Next, the defendant claims that the trial court erred in allowing a videotaped search of his residence into evidence. He claims that the trial court abused its discretion by allowing the state to play the videotape for the jury and that the jury was prejudiced by the videotape, which shows a jacket airbrushed with a picture of a smoking gun and the words "Thug Life." The state claims that the trial court properly admitted the videotape and that the videotape was not unduly prejudicial. We believe aspects of the videotape should have been redacted from the evidence, but we conclude that any error was harmless.

-6-

Before trial, the defense filed a motion asking the trial court to exclude the videotape from evidence. In a pretrial hearing, the defense argued that the videotape should be excluded because the only item found during the search that was relevant to the case was the black nylon briefcase, and a state witness would testify about finding the briefcase at trial. The defense also claimed that the "Thug Life" jacket in the videotape caused the probative value of the videotape to be substantially outweighed by the danger of unfair prejudice. The state claimed that the videotape, showing the airbrushed gun on the jacket and large amounts of ammunition in the defendant's home, was relevant to the state's theory that the defendant had a fascination with guns that motivated him to kill the victim. The trial court, without seeing the videotape, ruled that the videotape was relevant to the defendant's motive. The trial court, without explanation, also found that the probative value of the tape was not substantially outweighed by its prejudicial effect.

At trial, the state played the videotape for the jury during Detective Dudley's testimony. As the jury watched the videotape, Detective Dudley described the search of the defendant's bedroom to the jury. The following exchange occurred between the state and the detective:

> Q        Okay. Detective Dudley, I'd like for you to look at that jacket, if you would, and tell the jury what is air-brushed on the jacket, in particular on the left-hand side of the jacket as it appears . . . on the video.
>
> A        The term "Thug's Life."
>
> Q        What's down in the left-hand side, can you tell, what is air-brushed there beside the dice?
>
> A        I really can't tell, sir, from the video.
>
> Q        Did you look at it when you were there?
>
> A        Yes.
>
>          THE COURT: All right. Stop the video. Counsel, approach the bench.

At the bench, the state told the trial court that it was trying to get Detective Dudley to say that an airbrushed smoking gun was on the left side of the jacket. When the state offered to introduce the jacket into evidence, the court stated, "I don't think that in and of itself is a crucial issue in this case, the jacket. I understand why the state wants it in, but the fact that it's shown it, I'll let it go as it is, but I don't think we need to go any further." The state stopped questioning Detective Dudley about the jacket. However, the jury watched the remainder of the videotape, which showed a .22 caliber rifle in the defendant's bedroom and the black nylon gun case in the defendant's bedroom closet.

To be admissible, videotapes, like photographs, must be relevant to some issue at trial. See Tenn. R. Evid. 401. However, a videotape may still be excluded if its probative value is substantially outweighed by its potential to prejudice the defendant unfairly or to confuse or mislead the jury. See Tenn. R. Evid. 403. The admissibility of evidence is a matter within the trial court's discretion and will not be reversed on appeal absent an abuse of discretion. State v. Harris, 839 S.W.2d 54, 66 (Tenn. 1992).

Having viewed the videotape, we disagree with the trial court's finding that the videotape was relevant to show that the defendant had a fascination with guns that motivated him to kill and rob the victim. The videotape shows only one gun, a .22 caliber rifle, and a few bullets that the police found on the defendant's bedroom floor. In addition, the jacket did not support the state's motive argument because the smoking gun on the jacket was unrecognizable in the videotape. We note that when the trial court realized that Officer Dudley could not identify the smoking gun on the jacket, the trial court refused to allow the state to question him further about it. This indicates that, without testimony about the picture of the smoking gun on the jacket, the trial court believed that the words "Thug Life" made the danger of unfair prejudice substantially outweigh the jacket's probative value.

Although we do not believe that the videotape was relevant to show the defendant's motive, we do believe that it was relevant to illustrate Detective Dudley's testimony about finding the victim's black nylon gun bag under clothes in the defendant's bedroom closet. Nevertheless, the portion of the videotape showing the jacket should have been redacted from the videotape.

In any event, we conclude that the trial court's allowing the jury to view the entire the videotape is harmless. In Tennessee, "nonconstitutional errors will not result in reversal unless the error affirmatively appears to have affected the result of the trial on the merits, or considering the whole record, the error involves a substantial right which more probably than not affected the judgment or would result in prejudice to the judicial process." State v. Harris, 989 S.W.2d 307, 315 (Tenn. 1999) (citing Tenn. R. Crim. P. 52(a) and Tenn. R. App. P. 36(b)). In this case, Ms. Morris testified that the defendant told her that he was going to kill the victim, and Ms. Fuqua testified that she saw the defendant shoot the victim in the head. Moreover, the defendant confessed to Nathan Benford that he shot the victim in order to get the guns that were in the victim's car. With evidence of the defendant's guilt being strong, we cannot say that the admission of the entire videotape more probably than not affected the judgment. We conclude that the admission of the videotaped search of the defendant's residence into evidence was harmless.

### III. IMPROPER ARGUMENT

Finally, the defendant claims that he was prejudiced by the state's arguing outside of the record twice during closing argument. The state claims that the prosecutor's comments were not "entirely" out of the scope of the record at trial and that, in any event, the prosecutor's mistake was unintentional and harmless. We do not believe that the defendant is entitled to relief.

During direct examination, Faith Sharon Morris testified that when she and the defendant were at the defendant's mother's house, she saw the defendant with a pistol in his pants. Ms. Morris also testified that the defendant left the house with the victim. The following exchange then occurred:

> Q      Okay.  Do you recall whether or not Johnny Boy had the pistol?
>
> A      Johnny Boy had the pistol before they left.
>
> Q      Okay.  So when they left -- before they left, Johnny Boy had the pistol?
>
> A      Yes, before I left down going to his sister's house.
>
> Q      Where did he have the pistol?
>
> A      He had it down in his pants.
>
> Q      Okay.  You're talking about the pistol [the victim] brought in?
>
> A      Yes.
>
> Q      All right.  And then when he and [the victim] left together, do you know whether or not he may have still had the pistol?
>
> A      No, I don't know.

During closing argument, the following exchange occurred:

> [The State]:   You heard from Faith how Johnny Boy and [the victim] left together in his little silver car.  Johnny Boy had the gun stuffed in his belt, the handgun –
>
> [Defense]:     Objection, Your Honor, that's not in the record that he had the gun in his belt.
>
> [The State]:   I think it is in the record.
>
> THE COURT: Members of the jury, I will ask you, if statements are made during this closing argument by counsel for either side, that are not supported by the evidence, that's up to you to make that

-9-

determination, it will be up to you to remember the testimony. When you get in the jury room, you can discuss it, and go by the testimony the way you recall it and not what the attorneys say.

During the state's concluding remarks, the prosecution again stated that the defendant left the house with the pistol, and the defense objected. During a bench conference, the state agreed to "move away from" Ms. Morris's testimony, and the trial court did not give a second curative instruction.

Jury argument must be predicated on evidence which is introduced during the trial and is pertinent to the issues being tried. Russell v. State, 532 S.W.2d 268 (Tenn. 1976). Attorneys may not argue facts which are not of record. State v. Beasley, 536 S.W.2d 328, 330 (Tenn. 1976). Likewise, it is improper for an attorney to misstate evidence intentionally. See Granstaff v. State, 163 Tenn. 623, 45 S.W.2d 527 (1932).

Faith Morris stated that she did not know whether the defendant had the pistol in his pants when he left the house with the victim. Therefore, we agree with the defendant that the prosecution's statements were incorrect. In Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976), this court set out the following considerations for determining whether the state's conduct could have improperly prejudiced the defendant and affected the verdict:

1. The conduct complained of viewed in context and in light of the facts and circumstances of the case.

2. The curative measures undertaken by the court and the prosecution.

3. The intent of the prosecutor in making the improper statement.

4. The cumulative effect of the improper conduct and any other errors in the record.

5. The relative strength or weakness of the case.

In this case, the exchange that occurred between the state and the defense after the defense's first objection indicates that the state thought it was arguing facts in the record. In addition, after the defense's first objection, the trial court instructed the jurors to rely on their memory of the testimony, not counsel's arguments. Finally, taking the statements in context with all of the proof and the entire arguments, we cannot say that they affected the verdict.

Based upon the foregoing and the record as a whole, we affirm the judgment of the trial court.

_____

JOSEPH M. TIPTON, JUDGE