**Nolen W. RUSSELL, Petitioner,**

v.

**STATE of Tennessee, Respondent.**

Supreme Court of Tennessee.

Jan. 19, 1976.

Cunningham, Mitchell & Hicks, Clarksville, for petitioner.

W. Henry Haile, II, Asst. Atty. Gen., R. A. Ashley, Jr., Atty. Gen., Nashville, for respondent.

COOPER, Justice.

## OPINION

The petitioner, Nolen W. Russell, was indicted for the murder of his wife, Mary Shelton Russell. On the trial, the jury found petitioner guilty of murder in the second degree and fixed his sentence at not less than ten nor more than twenty years in the state penitentiary. Petitioner's conviction was affirmed by the Court of Criminal Appeals in a unanimous opinion. Certiorari was granted by this court, primarily to consider whether the closing argument of the district attorney general was improper and, if so, was it prejudicial.

It is undisputed in the record that Nolen W. Russell killed his wife in a particularly brutal manner. The medical examiner testified that Mrs. Russell had multiple lacerations and contusions about the head, a six inch laceration of the neck, and a small penetrating wound above the left breast with an adjacent smaller wound, which appeared to the medical examiner to be entrance and exit wounds caused by a bullet. Death was due to the multiple head injuries.

The petitioner did not testify; however, he did give a statement to the authorities. Through the statement and through the medical history related to psychiatrists who treated petitioner after the homicide, it appears that when petitioner walked into the kitchen of his home on the morning of February 22, 1972, his wife pointed a pistol at him and pulled the trigger. The pistol misfired. Petitioner then took the pistol from his wife and began striking her with it with such force the pistol broke into two parts. The broken pistol was found in the kitchen near the body of Mrs. Russell. Petitioner admitted to the investigating officers that in addition to the beating, he had cut his wife's throat and gave the sheriff the pocket knife he had used.

Petitioner plead both self-defense and temporary insanity, with his principal efforts being directed toward raising a question as to his sanity at the moment the homicide was committed. Two psychiatrists testified in support of the latter defense. Dr. William C. Greer, now superintendent of the Moccasin Bend Mental Health Center in Chattanooga, testified he saw Mr. Russell as a patient on February 24, 1972, two days following the homicide, and saw him a total of six times over a four month period; that psychological testing of Mr. Russell was done; that he had also treated Mrs. Russell who was a patient for about three years at the Harriet Cohn Mental Health Center in Clarksville, where Dr. Greer was director, and that he was familiar with the domestic situation between Mr. and Mrs. Russell; that Mrs. Russell at times was mentally ill, became paranoid and required treatment; that Mr. Russell was fearful his wife would harm him during a period of mental disorder; that Mr. Russell had shingles for a period of time prior to the homicide, had lost significant weight, developed insomnia from fear that his wife might do something to him in the middle of the night, and was also suffering from organic brain syndrome from hardening of the arteries; and that in his opinion, when Mrs. Russell pointed the gun at Mr. Russell, Mr. Russell went berserk and was not then "able to distinguish right from wrong."

Dr. W. L. Metts, who is on the teaching staff of the Vanderbilt Medical School and is Assistant Superintendent of Central State Psychiatric Hospital, testified he had seen Mr. Russell on five different occasions following the homicide, two at the Mental Health Center in Clarksville and three at the hospital in Nashville, where Mr. Russell was given several psychological tests. From these tests and the interviews with Mr. Russell, Dr. Metts concluded:

"It is impossible to say beyond a shadow of a doubt, but in my honest opinion, I feel that it is most likely that Mr. Russell could not determine right from wrong at that particular moment."

Several lay witnesses called by the state testified as to petitioner's actions before

and after the homicide and expressed the opinion that the petitioner acted normally.

With the evidence in this state, the issue of sanity was a material, and probably controlling, fact issue for the jury to decide. *See Brooks v. State*, 489 S.W.2d 70 (Tenn. 1972); *Mullendore v. State*, 183 Tenn. 53, 191 S.W.2d 149 (1949).

In his closing argument to the jury, the district attorney general had the following to say about the testimony of the psychiatrists.

"So what do you have? You have two people who are capable of setting in Nashville and telling you the exact minute of when somebody in Montgomery County went crazy. Several months or several weeks after it happened, and coming here and swearing to it.

"I want to show you what—let me show you the possibilities. He says they have some tests—three hundred questions they ask people. I wonder haw difficult it would be for a lawyer—me or some other lawyer, to get my hands on some of those tests and run off some mimeograph copies so I'd have some in the future—I wonder haw difficult it would be to set down with some friend psychologist and say show me which could be encircled here in order to make me look crazy. And he shows me this one, and this, and this one, this one.

"I'd take him in my office and I'd say, now I'll tell you something else. It doesn't matter one blooming bit what you tell the man, he's going to ask you some questions, but it doesn't matter whether they are truthful or not. I don't guess it does, or does it—do you ever—did you ever find out whether it was necessary that those questions be truthful or not and did you ever find out why he asked him if it wasn't—did you? Did you understand that, any of you?

"But anyway—so, it's based on these questions. So I take him in there and finally a boy comes in and he says, I'm not—I'm really in hot water—what's that, well, you know they caught me robbing this place over here, they caught me robbing it, and on top of that, I took pot shots at two or three guys—they're really onto me—all right, old boy. did you get away with any money? Oh, yeah, I got away with come money—lay it on the desk here. All right, I've got it. Now, I'm going to get you out of this thing.

"What did he say—I want you to set down here and memorize how to answer these three hundred questions right here. Can you do it—here's a copy of them. All right, I've got it. Now, I'm going into Court and I'm going to tell them that you're crazy as a bat—not now, but you were crazy for about five minutes while you were robbing the bank. And when you get up there, you tell them—it don't make any difference what you tell them—whether lies, truth or anything you want to—and—but you be sure and answer these three hundred questions here just exactly right.

"He goes up there and they ask him, and he says, yes sir, this boy is nuts, and then he comes down here and he says, now, gentlemen of the Jury, turn this man loose—."

At this point counsel for the defendant objected to the argument, and the following colloquy took place:

"MR. CUNNINGHAM:—I would suggest that the insinuations made by the Attorney General are not proper, and in a way, I resent the insinuations that he is making in this type of argument. That's all I can.

GEN. BAGWELL: Well, I want to assure the Court that I am making no insinuations, and especially not against Mr. Cunningham.

MR. CUNNINGHAM: There is nothing in the proof about this, Your Honor.

GEN. BAGWELL: The proof in this case is that Mr. Cunningham didn't even know about him going to a psychiatrist until after so there is no reflection there. I'm

talking about the necessity of being very careful and scrupulous about this type of case, as the Court somethimes charges a jury concerning circumstantial evidence—is exactly what I'm doing. I'm talking about the pitfalls and dangers of these types of things, and that's exactly what I was doing.

THE COURT: Anything further, Mr. Cunningham?

MR. CUNNINGHAM: No, your honor.

THE COURT: Well I think it's very important—of course, I don't like to interfere with argument of either counsel—counsel has a right in argument to draw his interpretation from the proof, but of course, it is necessary that the proof be in the record that the interpretation is being drawn from:

So I want to caution counsel to be careful about that."

Despite caution from the trial court, the district attorney general went on to say:

"All right. In situations like this, I say that due to these possibilities to where this type of thing—if it falls into hands of unscrupulous individuals, how dangerous it can be and how our Courts can become a mockery.

"It's not got like that here, and we don't want it to. . . ."

No instructions were given the jury by the trial judge relative to the argument of the district attorney general.

 As was pointed out in *Smith v. State*, 527 S.W.2d 737, (Tenn.1975), "we recognize that argument of counsel is a valuable privilege that should not be unduly restricted. Our courts seek to give great latitude to counsel in expressing their views of the case to the jury. In support of this policy trial judges have wide discretion in controlling the argument of counsel, and their action will not be reviewed absent abuse of that discretion." But the policy of allowing latitude to counsel in expressing their view of a case does not mean there are no limits on argument. Argument must be temperate, must be predicated on evidence introduced during the trial of the case, and must be pertinent to the issues being tried. The argument of the district attorney general in this case went beyond the pale of legitimate argument. In attacking the core of the defense, his statements raised the spectre of conspiracy, deceit and worse on the part of psychiatrists, psychologists, and attorneys and were not warranted by any evidence that appears in the record. The argument not only was improper but being on a material issue, undoubtedly had a prejudicial effect on the jury. At least, we cannot say beyond a reasonable doubt that prejudice did not result from the argument.

The judgment of conviction in this case is reversed and the case is remanded to the Criminal Court of Montgomery County for a new trial.

FONES, C. J., and HENRY, BROCK and HARBISON, JJ., concur.