IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 21, 2002

## LON S. WALKER v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Putnam County**
**No. 96-0087   Leon C. Burns, Jr., Judge**

_____

**No. M2001-01090-CCA-R3-PC - Filed November 13, 2002**
_____

Petitioner, Lon Walker, filed a petition for post-conviction relief from his conviction for second degree murder, alleging that he was denied effective assistance of counsel. Following an evidentiary hearing, the post-conviction court denied relief. In his appeal to this court, Petitioner raises the issue of whether the trial court erred in finding that Petitioner received effective assistance of counsel at trial. After a careful review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgement of the Criminal Court Affirmed.**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and NORMA MCGEE OGLE, JJ., joined.

Daryl A. Colson, Livingston, Tennessee, for the appellant, Lon S. Walker.

Paul G. Summers, Attorney General and Reporter; Kim R. Helper, Assistant Attorney General; William Edward Gibson, District Attorney General; Ben Fann, Assistant District Attorney General; and Lillie Ann Sells, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

### I. Factual Background

Shortly before 1:00 p.m., on Saturday afternoon, October 14, 1995, Jerry and Howard Harp arrived by taxi at the Petitioner's trailer. The Harp brothers had met Petitioner about a month earlier. Both Howard and Petitioner were drinking. Around 2:00 p.m., the three men traveled to Jackson County to purchase more liquor.

On their way home, they stopped by to see Stacy Patzer, a friend of the Petitioner's. Ms. Patzer, too, had met the Petitioner one or two months earlier, but she did not know either of the Harp brothers. Ms. Patzer and Petitioner were only "drinking buddies," and she was not romantically attached to Petitioner although she saw him frequently. Ms. Patzer invited the men into her home

and joined them in their drinking. After 30 or 40 minutes, the group decided to return to the Petitioner's trailer. Everyone but Jerry continued drinking as they played records and talked.

As the evening progressed, Ms. Patzer and Howard Harp began flirting and kissing, growing increasingly more affectionate. By this time, everyone except Jerry was intoxicated. Eventually, Howard fell asleep or passed out on a stool at the bar separating the trailer's kitchen and living room. While he slept, Jerry borrowed Petitioner's car and took Ms. Patzer back to her trailer to feed her dogs. When they returned after 30 or 40 minutes, Howard was awake and eating a cheeseburger that the Petitioner had fixed for him. Howard and Ms. Patzer resumed drinking.

After Jerry and Ms. Patzer returned, Petitioner called Jerry back into the bedroom and asked him why his brother was "hitting on" Ms. Patzer. The Petitioner told Jerry that he had bought drinks and dinner for Ms. Patzer, and been nice to her. Jerry reassured the Petitioner that Howard would eventually pass out and everything would be fine. They returned to the living room. Later that evening, Petitioner again called Jerry back to the bedroom and showed him a .38 caliber handgun which Petitioner kept in his bedroom, stashed between the waterbed mattress and the headboard. Jerry examined the gun, then handed it back to the Petitioner.

Around 9:00 p.m., Jerry left the trailer for the rest of the evening. A few minutes later, Petitioner's friend, Eric Christensen, stopped by after his shift at Waffle House ended. He noted that Howard and Ms. Patzer were extremely intoxicated. Howard was drinking beer as well as rum and coke. Both Eric and Benjamin Johnson, Petitioner's neighbor, commented that while Petitioner drank a lot, he never appeared drunk. Neither noticed any extreme signs of intoxication in Petitioner that night.

When Eric arrived, Ms. Patzer was talking on the telephone and appeared upset. Howard was trying to comfort her, placing his arm around her shoulder and rubbing his head against hers. Petitioner told Howard to mind his own business, shook his fist, and said someone's going to get hurt in five minutes. Howard got up and headed toward the back of the trailer, and Petitioner followed him. Eric, uneasy over the situation, also went to the back. He found Howard in the bathroom and Petitioner in the bedroom. After that, Eric left the trailer.

Later, Petitioner went over to see his neighbor, Benjamin Johnson, who was working outside, and asked Johnson to back him up if there was a fight. Johnson laughed, but the Petitioner did not return the laughter. Petitioner went back to his trailer.

By approximately 10:50 p.m., Ms. Patzer was sitting on a bar stool on the living room side of the bar, and Howard was standing less than three feet from Ms. Patzer, facing in her direction. Petitioner was standing opposite Howard on the kitchen side of the bar. Initially, Ms. Patzer stated that she caught a movement out of the corner of her eye, and she turned to look at the Petitioner. When she looked back, Howard was on the floor, on his back with a pool of blood beneath his head. Although she testified that there was no blood in the room except beneath Howard's head, her slacks were splattered with blood, and bits of brain matter and blood matted her hair.

Ms. Patzer began screaming. She picked up the phone in front of her and dialed 911. Before the call was answered, Petitioner pressed the disconnect button on the receiver and said they would handle the situation themselves. Ms. Patzer ran screaming to the bathroom and locked herself in. Pursuant to normal procedure when an emergency call is received, the 911 operator called back, and Ms. Patzer answered the call on the bathroom telephone. She told the operator that Howard Harp had just committed suicide.

Police were dispatched to the scene and arrived in approximately two minutes. Ms. Patzer was still in the bathroom and the Petitioner was outside. At the scene, officers found a .38 caliber handgun in the kitchen sink beneath a Coca-Cola cup. The gun had one spent round and five live rounds. The counter by the sink was wet. The Petitioner denied knowing where the gun came from, and said he was down the hall when the shot occurred. Ms. Patzer repeated several times that Howard had shot himself.

Ms. Patzer and Petitioner were transported to the Cookeville police station in separate cars. While waiting to be interviewed, Ms. Patzer kept saying that she couldn't believe Harp had killed himself. During her statement, Ms. Patzer said that they were having a good time. "Next thing I know he [Harp] pulled out a little gun in front of the door and held it up to his head, laughed, and pulled the trigger."

After the interviews, Ms. Patzer and Petitioner were driven back to Petitioner's trailer. At the station, the officers noticed a spot on Petitioner's tee shirt which appeared to be blood. Petitioner said the spot was spaghetti sauce but agreed to give them the shirt when he returned to the trailer. Officer Demming waited outside the trailer for five minutes before the Petitioner gave her the shirt. She put the shirt on the back seat of the squad car where Ms. Patzer had previously sat.

The Petitioner and Ms. Patzer spent the rest of Sunday at the trailer. Early Sunday morning, Ms. Patzer called her husband, Keith Patzer, who was in jail at that time awaiting trial, and told him about the suicide. She also learned that Officer Demming was the prosecuting officer on Keith's case. Ms. Patzer then called Officer Demming and asked her if Keith could be released for a few days to help her through the second interview. The request was denied.

Sunday night, Ms. Patzer accompanied the Petitioner to the home of Mr. and Mrs. Bennis, friends of the Petitioner, and spent the night. Ms. Patzer and the Petitioner continued to drink all through Sunday. On Monday, the pair traveled to Jackson County to purchase liquor, then picked up Ms. Patzer's employment check at Shoney's. After depositing the check, they returned to the Petitioner's trailer just as Detective Lane pulled up. He asked Ms. Patzer to accompany him to the station to go over her prior statement in order to resolve some questions he had. During the second interview, Ms. Patzer amended her prior statement and testified that Petitioner had killed Howard Harp. Ms. Patzer stated that she caught a glimpse of a gun in Petitioner's hand. She did not see him pull the trigger, but testified that Petitioner brought the gun to Howard's temple and shot. Ms. Patzer explained that she was intoxicated and the Petitioner was the one who suggested the idea that Howard had committed suicide, and she had simply wanted to believe it.

Prior to her amended statement on Monday, October 16, Ms. Patzer maintained that Howard Harp had committed suicide in numerous statements, both to the police officers assigned to the case as well as various friends and acquaintances. At trial, Petitioner's sole defense was based on the theory that Howard had shot himself . Defense counsel introduced medical records showing that Howard had attempted suicide several times since he was fifteen years old, and all of the attempts occurred while Howard was intoxicated. Jerry Harp, Howard's brother, testified that Howard told him on the morning of October 14, 1995, that he was going to kill himself, and that he was drinking at the time. Petitioner also maintained that Ms. Patzer's motive for changing her story was based on the belief that her husband was potentially facing significant jail time, and her cooperation might induce leniency.

At trial, several statements made by Ms. Patzer immediately following the shooting, as well as at the police station, in which she reiterated that Howard Harp had shot himself were admitted as substantive evidence as excited utterances. These statements included the 911 call Ms. Patzer made and the 911 call she received in response to her disconnected call. Defense counsel cross-examined Ms. Patzer at length on her statements. He then offered into evidence, as a prior inconsistent statement, her written statement to the police in which she stated that Howard Harp killed himself. The trial judge made a *sua sponte* instruction to the jury that the statement was to be considered for impeachment purposes only and not for the truth of the matters contained within the statement. Defense counsel did not object to the instruction and did not offer any basis for an exception to the hearsay rule.

## II. Procedural History

Petitioner was convicted of second degree murder on February 14, 1997 following a jury trial. At the conclusion of Petitioner's sentencing hearing, Petitioner was sentenced to twenty years in the Tennessee Department of Correction. Following a hearing, Petitioner's motion for judgment of acquittal and new trial was denied on June 13, 1997.

Petitioner filed a Notice of Appeal on July 9, 1997. On appeal, Petitioner raised three issues:

(1) whether the evidence was sufficient to sustain a conviction for second degree murder;
(2) whether the trial court erred in instructing the jury regarding prior inconsistent statements; and
(3) whether the trial court properly charged the jury regarding the impeachment of a witness.

On April 16, 1999, this court affirmed the trial court's judgment. *State v. Lon S. Walker*, No. 01C01-9711-CR-00535, 1999 WL 219629 (Tenn. Crim. App) *perm. to appeal denied* (Tenn. October 11, 1999).

Petitioner timely challenged his convictions in a pro se petition for post-conviction relief on February 17, 2000. He raised the following grounds for relief, all based on a claim of ineffective assistance of counsel: (1) counsel failed to object to the State's presentation of false or misleading information and argument to the jury on expert testimony; (2) counsel failed to object to the State's

improper vouching for the credibility of witnesses; (3) counsel failed to object to the State's closing argument which improperly called attention to the Petitioner's decision not to testify; (4) counsel failed to object to the State's closing arguments that improperly diluted the State's burden of proof and undermined the presumption of evidence; (5) counsel failed to object to the State's presentation of false evidence to the jury on gunshot residue and serology; (6) counsel failed to investigate and consult with experts concerning the testimony on gunshot residue and serology; (7) counsel failed to investigate Sherry Harp as to comments she heard concerning Mr. Harp's injuries; (8) counsel failed to object to the State's interference with the defense's communication with prospective prosecution witnesses; (9) counsel failed to discover that the State provided benefits to Stacy Patzer in exchange for her testimony, failed to object to her perjured testimony when she denied receiving benefits, and failed to object to the State's use of her perjured testimony in closing arguments; (10) counsel failed to investigate Ms. Patzger's family, social and criminal background; (11) counsel failed to conduct a thorough investigation of the facts of the case and possible defenses and make reasonable decisions concerning the investigation; (12) counsel failed to adequately prepare for trial; (13) counsel failed to adequately consult with Petitioner as to important issues and decisions regarding his defense and failed to maintain a proper confidential relationship with Petitioner; (14) counsel failed to develop an alternative defense strategy; (15) counsel failed to retain a psychosocial expert to testify as to Mr. Harp's mental state and suicidal tendencies; (16) counsel failed to adequately advise Petitioner on his right to testify or not testify; (17) counsel failed to prepare Mr. and Mrs. Bennis for trial; (18) counsel failed to object to the trial judge's jury instructions on out of court statements as well as the trial judge's *sua sponte* limiting instruction; (19) counsel failed to introduce proof at the hearing pertaining to Petitioner's motion for a new trial; and (20) counsel failed to object to the accuracy of the trial transcript on the grounds that it contains material omissions.

Petitioner's evidentiary hearing was held on April 16, 2001. Petitioner's proof consisted of his own testimony, the testimony of Petitioner's appellate counsel, and two witnesses who had testified at trial. The State presented the testimony of Petitioner's trial counsel and his counsel's investigator.

At the hearing, Petitioner alleged that the State made improper, misleading, false and prejudicial statements in the jury's presence concerning the gunshot residue tests and blood analyses performed on Petitioner and Mr. Harp. Because counsel did not object to the prosecution's examination of the State's expert witnesses or to closing arguments on these evidential issues, Petitioner claimed he was denied effective assistance of counsel. Petitioner also alleged that the State improperly vouched for the credibility of the State's witnesses when the prosecutor referred to the "nice police" and complimented James Lane on doing "an excellent job" investigating the case during closing arguments, and that counsel's failure to object to these statements had a prejudicial effect on Petitioner's trial.

Petitioner next claimed counsel was deficient in his performance because he did not object to the State's closing arguments which improperly commented on his decision not to testify, and that such failure was prejudicial to Petitioner. Specifically, Petitioner testified that such statements as

"Mr. Cameron [trial counsel] admitted it for him," referring to his counsel's explanation of why Petitioner had lied about owning the gun used in the shooting, impermissibly drew the jury's attention to the fact that Petitioner did not take the stand. Petitioner also alleged that the State's comment that "our victim hasn't has [sic] an opportunity to testify" accomplished the same impermissible result.

Petitioner alleged that counsel failed to object to the State's introduction of the results of a blood residue analysis on Petitioner's tee-shirt, as well as the tee-shirt itself, on the grounds that the analysis did not show whose blood was on the shirt, or when or how the blood was obtained. Petitioner testified that such evidence was prejudicial because it erroneously compelled the jury to infer that the blood was that of Mr. Harp.

At trial, the State presented evidence concerning the results of gunshot residue analyses performed on Petitioner, Ms. Patzer and Howard Harp. Agent Davis, a forensic scientist with the Tennessee Bureau of Investigation, testified that the tests performed on Petitioner and Ms. Patzer showed no elements indicative of gunshot residue, while Howard Harp's test was inconclusive as to gunshot residue. Petitioner alleged that his counsel should have investigated and secured an expert witness to explain why there was not more gunshot residue found on Mr. Harp since Petitioner alleged that Mr. Harp had committed suicide. Petitioner testified that he provided the name of a potential expert to his counsel before the trial but counsel did not call the witness to testify.

The State's serologist testified at trial that the spot of blood on the Petitioner's tee-shirt was human blood, but too small to type. At his post-conviction hearing, Petitioner testified that counsel should have provided the defense's own serologist to explain the difference between blood splatter and blood spots. Petitioner claimed that the fact that he did not have blood splatter on his clothes supported his defense that he was not in close proximity to the victim when the shot occurred.

Another witness Petitioner alleges should have been produced at trial was Sherry Harp, the victim's sister. Petitioner testified that counsel failed to interview Ms. Harp personally although Mr. Harris, Petitioner's investigator, had discussed her potential testimony prior to trial. Petitioner testified he believed Ms. Harp's testimony would have shown that the admitting personnel at Erlanger Hospital where Mr. Harp was transported told her that they believed the wound was caused by a suicide attempt.

Petitioner claimed that counsel was deficient in failing to interview Ms. Patzer, the State's only eye witness, prior to trial. Petitioner further alleged that he believed the State had purposively secluded Ms. Patzer so that the defense would not have an opportunity to talk with her, and that Ms. Patzer received benefits from the State in exchange for her testimony. He blamed counsel for not discovering evidence to support these charges, and that his performance was, therefore, ineffective in this regard. Petitioner also claimed that counsel was deficient in not objecting to Ms. Patzer's testimony that she had not received any benefit other than reimbursement for travel expenses.

Finally, Petitioner alleged that counsel inadequately investigated Ms. Patzer's background for purposes of impeaching her credibility as a witness and casting doubt on her truthfulness.

Petitioner next claimed that counsel failed to properly investigate the facts of the case or possible defenses, as well as discuss strategic decisions with Petitioner. Further, Petitioner alleged that counsel was inadequately prepared for trial. Petitioner testified about his counsel's failure: (1) to maintain communications with Petitioner, (2) to timely investigate witnesses, and (3) to properly prepare witnesses for trial. In addition, Petitioner charged that counsel's trial preparation was inadequate because Petitioner believed that counsel should have developed an alternative defense. However, in his testimony at the post-conviction hearing, Petitioner did not suggest what that defense might have been.

Petitioner's next allegation concerned counsel's failure to engage an expert witness to conduct a psychosocial autopsy on Mr. Harp. Petitioner testified that he believed the expert's testimony would explain Mr. Harp's mental state on the day of the shooting and his recurring suicidal tendencies, concluding that Mr. Harp more likely than not committed suicide.

Although Petitioner testified at the post-conviction hearing that he made the decision not to take the stand in his own defense at trial, Petitioner alleged that, in retrospect, this decision was ill-advised because of the overall ineffective assistance of counsel at trial.

Petitioner alleged that counsel improperly failed to object to the trial judge's *sua sponte* limiting instruction as well as the jury instructions pertaining to the admissibility of prior inconsistent statements. Although Petitioner failed to preserve the issues concerning improper instructions for appeal, this Court did address these claims. *State v. Lon S. Walker*, No. 01C01-9711-CR-00535, 1999 WL 219629 (Tenn. Crim. App. at Nashville, 1999).

At trial, Counsel introduced Ms. Patzer's written police statement as a prior inconsistent statement. The trial judge issued a *sua sponte* instruction to the jury stating that the statement could be considered for impeachment purposes only. At his post-conviction hearing, Petitioner alleged that the instruction was improper because, absent an objection as to the hearsay nature of the statement, the evidence should have been admissible as substantive evidence, and counsel failed to object to the instruction to the prejudice of Petitioner.

This Court concluded that Petitioner's issue concerning the trial judge's *sua sponte* instruction was without merit because the written police statement was actually extrinsic evidence of a prior inconsistent statement not denied by the witness. Tenn. R. Evid. 613. Accordingly, this Court concluded that while the statement should not have been admitted into evidence, the admission was harmless error. *Walker*, No. 01C01-9711-CR-00535, 1999 WL 219629, at 6. At his post-conviction hearing, Petitioner suggested in his testimony that the written police statement may have qualified as an excited utterance under Tenn. Rule 803, and therefore admissible as substantiative evidence.

Petitioner also argued that the trial judge erred in his instructions to the jury concerning the admissibility of out of court statements, and that counsel was deficient for failing to object to such instructions. The instructions addressed only the jury's consideration of a witness's out of court statement for impeachment purposes only, although some of the out of court statements were admitted as substantive evidence. In the direct appeal of Petitioner's conviction, this court concluded that the fact that the instructions could have been more detailed did not render the instruction improper, and, absent a special request for an additional charge, the trial court would not be held in error on this basis. *Walker*, No. 01C01-9711-CR-00535, 1999 WL 219629, at 6.

Petitioner claimed that counsel was deficient for failing to introduce proof in the form of live testimony rather than through affidavits at the hearing on Petitioner's motion for a new trial which contained allegations that the prosecutor improperly remarked that the testimony of one of Petitioner's witnesses was rehearsed. Petitioner's appellate counsel testified that the failure to introduce proof on this issue resulted in appellate counsel's inability to raise the issue on appeal. Petitioner also alleges that counsel was deficient in not objecting to the accuracy of the transcript on the grounds that the record omitted this remark. Finally, Petitioner claimed that counsel failed to object to the inaccuracy of the trial transcript because the transcript contained material omissions.

Trial counsel testified that he did not believe that the testimony by the State's expert witnesses regarding the blood spot found on Petitioner's tee-shirt, as well as the lack of gun residue on Petitioner's hands, harmed Petitioner's defense. On the contrary, trial counsel testified, the lack of any significant amount of blood on Petitioner's clothing supported the defense's theory that Petitioner was not in the vicinity of Mr. Harp when the shooting occurred. Although a gun shot residue expert was identified, counsel testified that Petitioner decided not to call the witness because of the expense involved and the doubtful value of the testimony. Counsel also testified that Petitioner had never requested a serologist. As far as securing an expert witness to testify as to the deceased's state of mind, counsel testified that he felt that this type of testimony, if he could find an expert in this field, would probably not be admissible in court.

Counsel also testified that Mr. Harris, Petitioner's investigator, interviewed Sherry Harp and attempted to locate the hospital personnel on duty the night Mr. Harp was brought in. Although Mr. Harris couldn't locate the potential witness, counsel said he believed in any event that this testimony would be either inadmissible or unhelpful. Counsel also testified that he made several attempts to locate Ms. Patzer before the trial. Even though he could not interview her before trial, counsel testified that he believed his cross-examination of Ms. Patzer was thorough and extensive.

Counsel next testified that he had often discussed with Petitioner the issue of him testifying, and as the trial preparation unfolded, he felt that the State's case was not that strong against Petitioner to warrant Petitioner taking the stand. Counsel further testified that he was concerned about Petitioner's drinking habits and his anger as a result of his arrest and the witnesses' testimony. Accordingly, counsel testified that he believed Petitioner's decision not to testify was correct under the facts and circumstances.

Counsel testified at the post-conviction hearing that he had visited Petitioner several times while Petitioner was in jail awaiting a bond hearing. Counsel further testified that either he or Mr. Harris interviewed all available witnesses, and that he met with and interviewed the State's forensic witnesses. In addition, Mr. Harris testified that he and Petitioner visited Petitioner's trailer to review the crime scene. During the week before trial, counsel testified that Petitioner was in counsel's office nearly every afternoon, and counsel spent the entire week, including the weekend, preparing for trial.

As far as preparing an alternative defense, counsel testified that he presented the only defense that was logically possible, a defense that was supported by Ms. Patzer's initial remarks. Counsel further testified that he had developed the defense used at trial as thoroughly as possible through testimony and medical records.

At the conclusion of the evidentiary hearing, the post-conviction court denied Petitioner relief in oral findings and conclusions as follows: (1) Petitioner failed to present proof that the State provided false or misleading evidence or that the State asked irrelevant questions concerning the gunshot residue and blood analyses, and, counsel, therefore, was not deficient for failing to object; (2) Petitioner failed to prove that counsel's failure to object to the State's closing arguments and examination of expert witnesses was prejudicial, or that there would have been with reasonable probability a different trial conclusion had he objected; (3) Petitioner failed to prove that counsel's failure to object to the State's comments on the job done by the Cookeville police department was prejudicial, or that a different result would have occurred if the objections had been made; (4) Petitioner failed to prove that the State directly commented on Petitioner's decision not to testify at trial, and failed to prove, therefore, that counsel's failure to object to the State's closing argument constituted ineffective assistance of counsel; (5) Petitioner failed to present proof that the State's burden of proof was either shifted or diluted, and that counsel's failure to object to any statements to that effect was deficient; (6) Even if counsel was deficient in not raising objections to some of the issues contained in subparts (1) through (5), Petitioner did not show that there was a reasonable probability that the results would have been different had counsel objected; (7) Petitioner failed to prove that counsel was deficient in failing to call additional expert witnesses; (8) Petitioner failed to prove that counsel was deficient in investigating Ms. Harp; (9) Petitioner failed to prove that counsel was deficient in not interviewing Ms. Patzer before trial and failed to present proof that counsel was hindered by the State in any way; (10) Petitioner failed to present proof that the State provided any benefits to Ms. Patzer other than statutorily approved reimbursement for travel expenses, and, counsel, therefore, was not deficient in failing to investigate this issue; (11) Petitioner failed to present proof that Ms. Patzer's testimony was perjured, and counsel, therefore, was not deficient in failing to investigate this issue; (12) Petitioner failed to prove that counsel was ineffective in investigating Ms. Patzer's background; (13) Petitioner failed to prove that counsel was deficient in investigating or preparing for trial, or adequately communicating with Petitioner about his trial; (14) Petitioner failed to present proof that a viable alternative defense existed and that counsel was deficient in developing such a defense; (15) Petitioner failed to prove that counsel was deficient for failing to call a psychosocial expert to testify on his behalf; (16) Petitioner failed to prove that Counsel's advice to Petitioner concerning his right to testify at trial was deficient; (17)

Petitioner failed to prove that counsel was deficient in preparing Mr. and Mrs. Bennis for trial; (18) Petitioner failed to prove that there was a reasonable probability that the trial conclusion would have been different if counsel had objected to the *sua sponte* instruction or the jury instructions concerning out of court statements; (19) Petitioner failed to prove that counsel was deficient in his preparation of Petitioner's motion for a new trial; and (20) Petitioner failed to prove counsel was deficient in not objecting to the trial transcript.

### III. Analysis

Petitioner's request for post-conviction relief is governed by the Post-Conviction Procedure Act of 1995. *See* Tenn. Code Ann. §§ 40-30-201 to -310 (1997). In order to obtain post-conviction relief, a petitioner must include allegations of fact supporting each claim for relief. *Id.* § 40-30-204(e). At the hearing, the petitioner has the burden of proving his allegations by clear and convincing evidence. *Id*. § 40-30-210(f).

Findings of fact made by the post-conviction court are given the weight of a jury verdict. *Black v. State*, 794 S.W.2d 752, 755 (Tenn. Crim. App. 1990). Therefore, this Court is bound by those findings unless the evidence in the record preponderates against the post-conviction court's findings. *Davis v. State,* 912 S.W.2d 689, 697 (Tenn. 1995). In conducting its review, this Court may not re-weigh or re-evaluate these findings nor substitute its inferences for those drawn by the trial judge. *State v. Honeycutt*, 54 S.W.3d 762, 763 (Tenn. 2001); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). In addition, questions concerning the credibility of witnesses and the weight and value given their testimony are resolved by the trial court, and not this Court. *Id.*, at 461. However, the trial court's application of the law to the facts is reviewed de novo, without a presumption of correctness. *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). If Petitioner raises a claim of ineffective assistance of counsel, the claim is a mixed question of fact and law and therefore also subject to de novo review. *Id.* at 458; *Burns*, 6 S.W.3d at 461.

To summarize, Petitioner alleges that he was denied effective assistance of counsel due to counsel's failure (1) to object to certain remarks, questions or inferences made by the State during the examination of witnesses or in closing arguments; (2) to investigate or prepare witnesses properly, or call expert witnesses to challenge the prosecution's evidence; (3) to adequately prepare for trial, develop an alternative defense, or advise Petitioner adequately about trial decisions, including Petitioner's decision on testifying; (4) to adequately prepare Petitioner's motion for a new trial; and (5) to object to the correctness of the trial transcript. After a review of the record, we conclude that Petitioner is not entitled to relief.

In order to prevail on a claim of ineffective assistance of counsel, Petitioner must establish that his counsel's performance fell below the range of competence required of attorneys in criminal cases. *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). Then, if counsel's performance does not meet the required standard of competence, Petitioner has the burden of proving that his counsel's deficient performance prejudiced Petitioner to the extent that there is a reasonable probability that the results of the trial would have been different but for the ineffective assistance of counsel.

*Strickland v. Washington*, 466 U.S. 668, 694, L.Ed.2d 674, 104 S.Ct (1984). 2052; *Butler v. State*, 789 S.W.2d 898, 900 (Tenn. 1990). If Petitioner fails to establish either deficiency or prejudice, relief will not be granted. *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996).

Counsel's performance will not be judged in hindsight, and this Court will not second-guess counsel's decisions regarding trial strategies and tactics. *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982); *Owens v. State*, 13 S.W.3d 742, 749 (Tenn. Crim. App. 1999). Rather, counsel's alleged errors will be judged from the point of time from which they were made in light of all the facts and circumstances at that time, and from the perspective of counsel. *Strickland*, 466 U.S. at 690, 104 S.Ct. 2052.

First, Petitioner contends that his counsel failed to object to certain remarks, comments and inferences made by the State in either its examination of expert witnesses or during closing arguments when discussing the results of the gunshot residue, blood, and latent fingerprint analyses. Petitioner also alleged that the prosecutor used perjured testimony in his arguments without the objection of Petitioner's counsel. Because counsel failed to object to the prosecutor's improper remarks, the overall effect, Petitioner alleged, was to shift the burden of proof from the State to the Petitioner.

Testimony established that there was minimal gunshot residue on Mr. Harp, and what residue that was found was limited to Mr. Harp's palms. Although Petitioner's gunshot residue analysis was returned negative, the State's expert witness also testified that very minimal particles of antimony and barium were found on Petitioner's hands. This residue, however, was so minimal that its presence did not alter the test's conclusions, nor could the expert say where the Petitioner had acquired such elements. When asked why a person might not have gunshot residue on their hands, the expert witness testified that washing one's hands could eliminate any residue.

The testimony also showed that Petitioner was alone in the trailer after the shooting for a period of approximately two minutes between the time Ms. Patzer locked herself in the bathroom and the police arrived. Fresh water puddles were found around the sink. No fingerprints were found on the gun, and Howard Harp was lying on the floor, mortally wounded. From this evidence, the State argued that Petitioner might have washed his hands at the sink and wiped off the fingerprints.

Finally, Petitioner argued at trial that Mr. Harp shot himself, but the tests performed on Mr. Harp showed that gunshot residue was present only on his palms. Accordingly, the State argued that Mr. Harp did not pull the trigger, but rather had thrown up his hands to ward off the shot.

The post-conviction court concluded, after a review of the record, that the State's proposed inferences were reasonably drawn from the evidence presented at trial, and Petitioner did not present clear and convincing evidence at the post-conviction hearing to support his claim that such inferences were improper, or that the inferences, when taken together, either shifted or diluted the State's burden of proof. The post-conviction court found that even if some of the inferences or questions to witnesses strayed beyond the permissible limit, Petitioner did not show that his defense

was prejudiced, or that the trial results would have been any different, absent the objectionable arguments.

Provided that the evidence meets the general rules governing relevance, the State may introduce expert testimony if the expert has knowledge that will substantially assist the trier of fact to determine a fact or understand the evidence. Tenn. R. Evid. 702; *State v. Hall*, 958 S.W.2d 679, 689 (Tenn. 1997) *cert. denied* 524 U.S. 941, 118 S.Ct. 2348, 141 L.Ed.2d 718 (1998). While testifying, the expert witness may form an opinion or inference based on the underlying facts, and the jury is free to agree or disagree with the inferences and theories proposed by the State's expert witnesses. *See* Tenn. R. Evid 703.

In any litigation, both the prosecution and the defense are given a certain degree of latitude as they present their case to the jury. However, this latitude is not unlimited, and the trial judge must control the actions of counsel during summation and examination of witnesses. *Smith v. State*, 527 S.W.2d 737, 739 (Tenn. 1975); *Russell v. State*, 532 S.W.2d 268, 271 (Tenn. 1976). While neither the defense nor the prosecution may present irrelevant or confusing arguments, counsel may argue both the facts in the record, and any reasonable inferences that may be drawn from such facts. *Coker v. State*, 911 S.W.2d 357, 368 (Tenn. Crim. App. 1995) *overruled on other grounds,* 19 S.W.2d 753 (Tenn. 2000). Based upon the record, we concur with the post-conviction court that Petitioner has not met his burden of proof on these issues, nor shown that the prosecutor's inferences were prejudicial to his case.

Petitioner claimed that the State secluded Ms. Patzer prior to trial so that the defense could not interview her. Petitioner also alleged that the State paid or extended certain unidentified benefits to Ms. Patzer in exchange for her testimony, but the only benefit shown at the post-conviction hearing was Ms. Patzer's reimbursement for travel expense which are statutorily approved for out-of-state witnesses. *See* Tenn. Code Ann. §§ 40-17-201 through -212. These allegations were unsupported by testimony or other "clear and convincing evidence" at the post-conviction hearing. *See* Tenn. Code Ann. §§ 40-30-204(e) and 210(f). Consequently, the evidence does not preponderate against the trial court's conclusions regarding these allegations.

Next, Petitioner also alleged ineffective assistance of counsel because of counsel's failure to call expert witnesses to refute the prosecution's evidence on latent fingerprints, gunshot residue and blood analyses, and a psychosocial expert to testify as to Mr. Harp's mental state and suicidal tendencies on the day of the shooting. He also alleges counsel was ineffective for not calling as a witness the admitting personnel on call the night Mr. Harp was brought into Erlanger Hospital. At the post-conviction hearing, Petitioner was not able to identify the name of the pertinent hospital employee, and could only speculate as to what the witness might say. Moreover, the Petitioner did not produce any expert witnesses at the post-conviction hearing to prove what the testimony at trial would have been, relying once again on speculation as to how the testimony might have helped Petitioner's defense.

If Petitioner alleges that counsel failed to discover or call witnesses at trial, he must make the witnesses available at the evidentiary hearing. *Black v. State*, 794 S.W.2d at 757. Only by producing witnesses can Petitioner establish by clear and convincing evidence that a material witness "(a) could have been found by a reasonable investigation and (b) would have testified favorably in support of his defense if called." *Id.* at 758. Without the production of any expert witnesses on Petitioner's behalf or the identification of the described hospital personnel, the post-conviction court found that the Petitioner did not present sufficient proof to support his claims. We concur with the post-conviction court's findings.

Petitioner alleges that counsel failed to adequately prepare himself and Petitioner for trial, investigate Ms. Patzer's background to challenge her credibility, prepare Mr. and Mrs. Bennis for trial or to develop a viable defense strategy. At the post-conviction hearing, both Petitioner and counsel testified about the various steps taken and decisions made in preparation for trial. Based upon the testimony and evidence presented, the post-conviction court found no proof to support Petitioner's allegations that counsel was inadequately prepared for trial or that counsel failed to properly communicate with Petitioner concerning his trial. The evidence does not preponderate against the trial court's findings.

Petitioner claimed that counsel's advice concerning Petitioner's right to testify was ineffective primarily because counsel did not sufficiently and adequately explain the consequences of Petitioner's decision at the time of trial, and Petitioner's decision not to testify appeared, in hindsight, to be inadvisable.

A defendant has a fundamental right to testify at his trial, and this right is personal to the defendant. *Momon v. State*, 18 S.W.3d 152, 161 (Tenn. 1999). Therefore, only the defendant can voluntarily relinquish this right. *Id.* To insure that a defendant's decision not to testify is made intentionally, evidence of the waiver must be in the trial record. *Id.*, at 162. At any time prior to the conclusion of proof, defense counsel must request a hearing, out of the presence of the jury, "to inquire of the defendant whether the defendant has made a knowing, voluntary, and intelligent waiver of the right to testify." *Id.*

At trial, counsel and Petitioner engaged in the following dialog:

Q:     May it please the Court, I asked the Court because I think it's required by the rules. Mr. Walker and I discussed at length this case and whether or not he would testify in this matter. He chose not to. I told Mr. Walker we would have to put that on the record. Mr. Walker, you and I have talked about that quite a bit. We've talked about it for months, haven't we.

A:     Yes, we have.

Q:     And quite frankly, I told you what my recommendation was but the ultimate decision was yours. Is that correct?

A:    That's correct.

Q:    And you made that decision and your decision was not to testify.

A:    That's correct.

There is no particular language that defense counsel must use in submitting this evidence, but, generally, counsel must show "that the defendant knows and understands that:

(1) the defendant has the right not to testify, and if the defendant does not testify, then the jury (or court) may not draw any inferences from the defendant's failure to testify;

(2) the defendant has the right to testify and that if the defendant wishes to exercise that right, no one can prevent the defendant from testifying;

(3) the defendant has consulted with his or her counsel in making the decision whether or not to testify; that the defendant has been advised of the advantages and disadvantages of testifying; and that the defendant has voluntarily and personally waived the right to testify."

*Momon v. State*, 18 S.W.3d at 162.

While counsel might have been more detailed in his presentation of this testimony to the court, our review of the record reveals that the Petitioner knowingly and willingly decided not to testify at his trial. Counsel testified that he and the Petitioner spoke several times about Petitioner's right to testify and that they discussed the advantages and disadvantages such a decision entailed. The post-conviction court found no evidence to the contrary. Accordingly, we agree that the Petitioner has failed to carry his burden of proof on this allegation.

On direct appeal of the conviction, this Court concluded that Petitioner's claims concerning the jury instructions on admissibility of out of court statements and the trial judge's *sua sponte* limiting instruction were harmless error. The post-conviction court found that Petitioner had failed to prove he was prejudiced by any alleged deficiency by his counsel concerning these issues. We agree. The jury heard ample testimony concerning the inconsistent statements made by Ms. Patzer immediately following the shooting, including her initial statements made to the police and on the 911 call. These statements were properly introduced as substantive evidence pursuant to Tenn. R. Evid. 802(2). The written police statement later introduced for impeachment purposes merely corroborated Ms. Patzer's earlier statements. Accordingly, we concur with the post-conviction court's findings that Petitioner has not shown he was prejudiced by the instructions even if his counsel's performance in not raising objections was ineffective.

Petitioner alleged in his brief that counsel's assistance was ineffective for failing to raise an objection to evidence that was inconsistent with the physical evidence at the crime scene. Petitioner

refers to his post-conviction petition, but the section identified does not discuss or raise this issue, nor was the issue presented to the post-conviction trial court. Accordingly, this issue has been waived. Tenn. Code Ann. § 40-30-206(g).

## CONCLUSION

After a thorough review of the record and the law applicable to the issues raised, we find that the Petitioner is not entitled to relief in this appeal. Accordingly, the judgment of the post-conviction court is affirmed.

 

 

_____

THOMAS T. WOODALL, JUDGE