IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
September 18, 2002 Session

## DONALD G. BROOKS v. STATE OF TENNESSEE

**Direct Appeal from the Circuit Court for Montgomery County**
**No. 040870     John H. Gasaway, III, Judge**

---

**No. M2002-00386-CCA-R3-PC - Filed February 11, 2003**

---

Petitioner, Donald G. Brooks, filed a petition for post-conviction relief from his convictions for first degree felony murder, especially aggravated robbery, theft of property over $1,000 and setting fire to personal property. In his petition, Petitioner alleged that he received ineffective assistance of counsel at trial and on appeal. Following an evidentiary hearing, the post-conviction court concluded that Petitioner's appellate counsel had rendered ineffective assistance when he failed to request a transcript of Petitioner's sentencing hearing on appeal. The post-conviction court found that all of the other grounds presented by Petitioner for post-conviction relief were without merit. After a careful review, we affirm in part and reverse in part the judgment of the post-conviction court.

**Tenn. R. App. P. 3, Appeal as of Right;**
**Judgment of the Circuit Court Affirmed in Part and Reversed in Part**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which James Curwood Witt, Jr., J., joined. ROBERT W. WEDEMEYER, J., not participating.

Robert T. Bateman, Clarksville, Tennessee, for the appellant, Donald G. Brooks.

Paul G. Summers, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; John Wesley Carney, Jr., District Attorney General; and Arthur Bieber, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

## I. Procedural History

Following a jury trial, Petitioner, Donald G. Brooks, was convicted of first degree felony murder, especially aggravated robbery, theft of property over $1,000 and setting fire to personal property. He was sentenced to life imprisonment for first degree felony murder, twenty-five years for especially aggravated robbery, four years for theft of property, and two years for setting fire to personal property. The trial court ordered the murder, robbery and setting fire sentences to be served

consecutively and the theft sentence to be served concurrently, for an effective sentence of life plus twenty-seven years. Petitioner was represented by different counsel at trial and on appeal.

In his direct appeal, Petitioner challenged the sufficiency of the convicting evidence and the length of his sentence. Petitioner did not specifically challenge the trial court's order of consecutive sentencing in his brief but argued instead that his sentence was excessive because his crimes should have been merged into one conviction. The State, on the other hand, interpreted Petitioner's sentencing issues as a challenge to the trial court's order of consecutive sentencing and argued in its brief that Petitioner was an appropriate candidate for consecutive sentencing. After denying Petitioner's request for merger of his crimes into one conviction, this Court concluded that a review of the trial court's sentencing determinations was precluded because the record on appeal did not include a transcript of the sentencing hearing upon which the trial court's determinations were based. On June 9, 1998, this Court issued an opinion affirming the judgment of the trial court. *State v. Brooks*, No. 01C01-9703-CC-00099, 1999 WL 219629 (Tenn. Crim. App. June 9, 1998), *perm. to appeal denied* (Tenn. December 7, 1998).

On June 21, 1999, Petitioner challenged his convictions in a pro se petition for post-conviction relief, as amended after appointment of counsel, alleging ineffectiveness of counsel at both the trial and appellate levels. Following an evidentiary hearing, the post-conviction court determined that Petitioner's appellate counsel had rendered ineffective assistance of counsel when he failed to request a transcript of the sentencing hearing on appeal which resulted in the inability of this Court to review the issue of consecutive sentencing. The post-conviction court concluded that "the Petitioner should be allowed appellate review of the issue of consecutive sentencing." The post-conviction court denied Petitioner's request for post-conviction relief on all other grounds.

Petitioner now appeals that portion of the post-conviction court's determination that he received effective assistance of counsel at trial and on appeal. Petitioner alleges that trial counsel's conduct was deficient because trial counsel failed to (1) challenge the trial court's charge to the jury on the possible range of punishment for each offense in the indictment except first degree felony murder and improperly referenced life imprisonment without the possibility of parole and death as possible punishments for first degree felony murder when the State did not seek these sentences; (2) object to the trial court's charge to the jury that failed to charge the lesser-included offenses for first degree felony murder; (3) object to improper comments by the prosecution during closing arguments; (4) adequately interview and investigate witnesses who could have strengthened Petitioner's alibi and provided information concerning another potential defendant; and (5) adequately advise Petitioner of his right to testify at trial and insure that Petitioner knowingly waived his right to testify. In addition, Petitioner alleges that his appellate counsel also rendered ineffective assistance when he failed to appeal the trial court's jury instructions, the prosecution's improper comments in closing argument, and the violation of Petitioner's constitutional right to be heard.

Petitioner concludes his argument with a catch-all allegation that the trial court erred in denying Petitioner relief on all other issues raised in his original petition for post-conviction relief that were not specifically addressed in his brief. Not only does Petitioner fail to identify specifically

which issues he is referring to, Petitioner presents no arguments, authority or references to the record which would support the claims purportedly raised in this general allegation. Therefore, we find the allegations which Petitioner attempts to raise in his concluding argument are waived under Rule 10(b) of the Court of Criminal Appeals of Tennessee. *See also* Tenn. R. App. P. 27(a)(7); *State v. Killebrew*, 760 S.W.2d 228, 231 (Tenn. Crim. App. 1988), *perm. to appeal denied* (Tenn. 1998).

## II. Factual Background

On October 28, 1994, Floyd Byrd, a truck driver, spotted a man lying on the side of the road. He drove to Hopkinsvile Elevator Company and told two employees to call 911. When the emergency medical personnel arrived on the scene, they could not save the victim, Mr. Wisniewski. Shelly Hogue, a secretary at Hopkinsville Elevator, testified that she saw a cream color car speeding up Barge Point Road around 4:00 p.m.. A white man with shoulder length, dark hair was in the car. Adeline Wisniewski, the victim's wife, testified that the victim owned a light beige 1985 Chrysler New Yorker with a handicap license plate.

Edwin Lunceford, an inmate in the Montgomery County jail at the time of trial, testified under a conditional grant of immunity from prosecution. According to Mr. Lunceford, he and Petitioner met at the Pickle Factory on October 28, 1994. The pair drank throughout the afternoon and were joined by Randy Herdman, Rosemary Devito and the victim. At some point, the victim offered to take Mr. Herdman home. Mr. Lunceford, however, actually drove because the victim was intoxicated. Petitioner, Mr. Lunceford, Mr. Herdman and the victim left the Pickle Factory in the victim's car. On the way to Mr. Herdman's house, Petitioner bought a twelve-pack of Bud Light beer. The men dropped Mr. Herdman off at his home and drove off. They stopped to relieve themselves on Barge Point Road. After Mr. Lunceford was finished, he turned around and saw Petitioner holding the victim by the head with a knife to the victim's throat. Petitioner told Mr. Lunceford to get the victim's wallet off the trunk. Mr. Lunceford punched the victim on the jaw so that the victim would not be able to identify them. Petitioner then cut the victim's throat with his knife.

Leaving the victim by the side of the road, Petitioner and Mr. Lunceford drove off, with Petitioner driving. During the afternoon, they bought and smoked some crack cocaine and then drove to Copper Creek. Petitioner gave Mr. Lunceford $40 from the victim's wallet and then threw Petitioner's knife and the wallet onto the creek bank. When Petitioner and Mr. Lunceford inspected the trunk of the victim's car, they found four half gallon containers of whiskey, two cartons of cigarettes, a tool box, and other items.

Petitioner and Mr. Lunceford continued driving around until they headed for the home of Connie Gonzalez, the Petitioner's girlfriend. They parked the victim's car in the breeze way of a church building near Ms. Gonzalez's home, doused the car with charcoal lighter fluid and set it on fire. They spent the night at Ms. Gonzalez's home, drinking and smoking crack cocaine. While they were there, Petitioner hid the victim's car keys in a stuffed animal.

After Mr. Lunceford approached the police, he agreed to wear a "wire" to tape his conversations with Petitioner. During his first conversation, Petitioner admitted killing the victim, but the wire malfunctioned. Later, Petitioner denied knowing anything about the crime, and he laughed when he said that.

At trial, Ms. Gonzalez testified that she called the Pickle Factory earlier in the afternoon to see when Petitioner was going to visit her. Petitioner told her "they" were going to drop Mr. Herdman off at his house and come on over. Later, when Petitioner had not shown up, Ms. Gonzalez telephoned Mr. Herdman who told her "they" had just left. Petitioner and Mr. Lunceford arrived at Ms. Gonzalez's home an hour and a half to two hours later.

Ms. Gonzalez confirmed that Petitioner and Mr. Lunceford spent the night at her house. She said the men arrived with some beer and two half gallons of whiskey.

Lorena Parr, an employee of the Money Tree, confirmed that Detective Alan Charvis of the Clarksville Police Department, retrieved a tool box from the pawn shop. Detective Charvis testified that the location of the tool box and the identity of the person who pawned it was consistent with the information provided by Mr. Lunceford.

Detective Scott Cutler of the Clarksville Police Department recovered two Bud Light cans from Barge Point Road. The latent fingerprints on the cans matched Petitioner's fingerprints. During a search of Ms. Gonzalez's home, the police officers discovered a torn stuffed animal with the victim's keys and key ring inside.

Doctor Charles Harlan, assistant county medical examiner and consulting forensic pathologist for Montgomery County, conducted an autopsy on the victim. The autopsy revealed a 6.60 inch incision of the victim's neck and trachea which Dr. Harlan testified was consistent with an incision made by a knife. Dr. Harlan also stated that the victim had a fractured jaw and lacerations around the mouth which were inflicted at or near the time of death.

Mike Nelson, an inmate with the Department of Correction, shared a cell with Petitioner in June, 1996. Mr. Nelson testified that the Petitioner told him that Petitioner had killed a man and burned the victim's car at a church.

In support of his defense, Petitioner presented the testimony of Debbie O'Bryan, a former bartender and manager of the Pickle Factory. She recalled that Petitioner, Mr. Lunceford and the victim were at the bar the afternoon of the murder but did not remember seeing Mr. Herdman. According to her testimony, Petitioner left the bar periodically but was never gone longer than ten or fifteen minutes. Petitioner was at the bar when Ms. O'Bryan left to buy cigarettes and chewing gum for the bar, and he was there when she returned forty-five minutes later.

Dorothy Suggs, a part-time employee of the Pickle Factory at the time of the murder, did not learn about the victim's death until some time later. Ms. O'Bryan reminded her that the murder

occurred on the day Ms. Suggs had joined the victim and others in drinking at the bar. Ms. Suggs recalled that the victim said he wanted to go to another bar at some point in the afternoon, and it was a patron known as "Boston Rick" who had driven the victim's car, not Mr. Lunceford. Ms. Suggs testified that Petitioner did not leave with the victim, Mr. Lunceford and Boston Rick.

Melissa Ann Springfield Conner, Fred Lunceford, Robert Lyle and Jonathan Mitchell each testified that Mr. Lunceford had told them about the murder and his cooperation with the police despite the police's order not to discuss the case with others. Mr. Fred Lunceford, Mr. Lyle and Mr. Mitchell testified that Mr. Lunceford had told conflicting stories about the murder.

On this evidence, the jury found Petitioner guilty of first degree felony murder, especially aggravated robbery, theft of property valued over $ 1,000, and setting fire to personal property.

## III.  Post-conviction Hearing

At the post-conviction hearing, Petitioner presented the testimony of Detective Alan Charvis, Dorothy Suggs, Debbie O'Bryan, Randall Herdman, and his trial counsel, Edward DeWerff. Petitioner also testified in his own behalf.

Detective Charvis testified that latent fingerprints had been recovered from a plastic bag and a plastic bottle of lighter fluid found at the crime scene but that the fingerprints had not been identified. Detective Charvis could not recall whether he had discussed these fingerprints with Mr. DeWerff. On cross-examination, Detective Charvis said that the Clarksville Police Department had fingerprinted Richard Roberts.

Mr. DeWerff testified next concerning his representation of Petitioner during the trial. Mr. DeWerff stated that he had little personal recollection of the trial, and Petitioner's file, along with others, were destroyed during a tornado in 1999. He remembered, however, that the relationship with Petitioner was "average," and he had no recollection of any arguments or strains between himself and Petitioner. Although he couldn't remember all of the witnesses he had interviewed, Mr. DeWerff believed he did talk with Dorothy Suggs. In addition, Mr. DeWerff said that he had located a potential alibi witness whose name had been provided by Petitioner, but the man was not able to provide any useful admissible testimony. Mr. DeWerff said that his time sheets indicated that he had at least contacted an investigator, but he could not remember if one was actually hired. Although he could not specifically remember, Mr. DeWerff was confident that he and Petitioner had discussed Petitioner's right to testify at trial.

Dorothy Suggs testified that she arrived at the Pickle Factory the day of the murder around 1:30 p.m. or 2:00 p.m. and joined the victim, Mr. Lunceford and Petitioner in drinking. At some point, the victim indicated that he wanted to go to another bar, and Mr. Roberts volunteered to take him because the victim was intoxicated. The victim, Mr. Roberts and Mr. Lunceford left the bar together, and Petitioner stayed behind, sitting next to Ms. Suggs' husband, Billy Joe Johnson. Ms. Suggs stated that Mr. DeWerff had not interviewed or called her husband, who was now deceased,

as a witness at trial. Ms. Suggs said she also knew Rosemary Devito Shepard, Mr. Roberts' ex-girlfriend, and that Mr. Roberts had cut Ms. Shepard's neck during an altercation at some point in their relationship. On cross-examination, Ms. Suggs admitted that her testimony at trial was substantially the same as her testimony at the post-conviction hearing.

Petitioner next took the stand and testified that both he and Mr. DeWerff had remained undecided about whether Petitioner would testify until the trial began. Then, Petitioner said that Mr. DeWerff advised him not to testify so that the prosecution would not get a chance to "chew him up" on cross-examination. Petitioner contends that he should have been given the opportunity to tell the jury that he was not present when the victim was killed. Petitioner admitted, however, that he was at the church when the victim's car was burned. Contrary to Ms. Suggs' testimony, Petitioner also said that he left the Pickle Factory with the victim, Mr. Lunceford and Mr. Herdman, but said that the victim and Mr. Lunceford took him back to the Pickle Factory after they dropped Mr. Herdman off at his house. According to the Petitioner, the victim and Mr. Lunceford then drove off together while Petitioner remained at the bar. Petitioner explained that his fingerprints were on the beer cans found at the crime scene because he was the one who had bought the beer at Beech's Market as the group rode to Mr. Herdman's house.

Two more witnesses testified to the events on the day the victim was killed. Ms. O'Bryan offered little additional information because she left the bar before the victim did, although she, too, had heard the story of Mr. Robert's attack on Ms. Shephard. Mr. Herdman testified that the victim, Mr. Lunceford and Petitioner gave him a ride home. They stopped at Beach's Market, and Petitioner got out to buy beer. When they dropped Mr. Herdman off, one of the men told Mr. Herdman that they were going to ride around in the country and drink beer.

## IV. Standard of Review

A petitioner seeking post-conviction relief must establish his allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-210(f) (1997). The trial court's findings of fact in a post-conviction hearing are afforded the weight of a jury verdict. *Black v. State*, 794 S.W.2d 752, 755 (Tenn. Crim. App. 1990), *perm. to appeal denied* (Tenn. 1990). Therefore, this Court may not re-weigh or re-evaluate these findings nor substitute its inferences for that of the trial judge unless the evidence in the record preponderates against those findings. *State v. Honeycutt*, 54 S.W.3d 762, 763 (Tenn. 2001); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). In addition, questions concerning the credibility of witnesses and the weight and value given their testimony is resolved by the post-conviction court, and not this Court. *Id.* However, this Court's application of the law to the facts is reviewed de novo, without a presumption of correctness. *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). A claim that counsel rendered ineffective assistance is a mixed question of facts and law and therefore also subject to de novo review. *Id.*; *Burns*, 6 S.W.3d at 461.

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, he must establish that counsel's performance fell below "the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). In

addition, he must show that counsel's ineffective performance actually adversely impacted his defense. *Strickland v. Washington*, 466 U.S. 668, 693, 104 S. Ct. 2052, 2067, 80 L. Ed.2d 674 (1984). In other words, a petitioner must show that there is a reasonable probability that the outcome of the proceedings would have been different had it not been for the deficiencies in counsel's performance. *Strickland,* 466 U.S. at 694; 104 S. Ct. at 2068.

In reviewing counsel's performance, the distortions of hindsight must be avoided, and this Court will not second-guess counsel's decisions regarding trial strategies and tactics. *Hellard v. State,* 629 S.W.2d 4, 9 (Tenn. 1982). The reviewing court, therefore, should not conclude that a particular act or omission by counsel is unreasonable merely because the strategy was unsuccessful. *Strickland,* 466 U.S. at 689, 104 S. Ct. at 2065. Rather, counsel's alleged errors should be judged from the point of time from which they were made in light of all the facts and circumstances at that time, and from the perspective of counsel. *Strickland*, 466 U.S. at 690, 104 S. Ct. at 2066.

A petitioner must satisfy both prongs of the *Strickland* test before he or she may prevail on a claim of ineffective assistance of counsel. *See Henley v. State,* 960 S.W.2d 572, 580 (Tenn. 1997). That is, a petitioner must not only show that his counsel's performance fell below acceptable standards, but that such performance was prejudicial to the petitioner. *Id.* Failure to satisfy either prong will result in the denial of relief. *Id.* Accordingly, this Court need not address one of the components if the petitioner fails to establish the other. *Strickland*, 466 U.S. at 697, 104 S. Ct. at 2069.

## V. Ineffective Assistance of Counsel

### A. Jury Instructions

Petitioner alleges first that trial counsel rendered ineffective assistance when he failed to object to the trial court's charge to the jury outlining the range of punishment for the offenses listed in the indictment. Specifically, Petitioner contends that the jury instructions were improper because the trial court failed to inform the jury as to the minimum number of years that Petitioner would have to serve on his life sentence before he was eligible for parole. Secondly, Petitioner contends that trial counsel improperly failed to object to the trial court's reference to life imprisonment without the possibility of parole and death as possible punishments for first degree felony murder when the State did not seek either punishment. Finally, Petitioner alleges that appellate counsel rendered ineffective assistance when he failed to raise these issues on appeal.

At the time of Petitioner's trial in 1996, the trial court was required to instruct the jury as to the possible penalties for each offense charged and lesser-included offenses, upon motion of either party. Tenn. Code Ann. § 40-35-201(b)(1) (repealed 1998). If a party requested a charge as to possible penalties, the trial court was also required to include in the jury instructions an approximate calculation of the minimum number of years the defendant must serve before eligible for parole. Tenn. Code Ann. § 40-35-201(b)(2)(A)(i) (amended 1998).

The mandate that jurors be informed of the possible punishments facing a defendant reflected the public's "desire for truth in the sentencing process." *State v. King*, 973 S.W.2d 586, 591 (Tenn. 1998). As summarized by the Tennessee Supreme Court:

> As a matter of policy, the legislature has decided that the sentencing information is relevant because jurors are better off having concrete information on these issues rather than being left to speculate on their own. The rationale for permitting an instruction on the range of punishment, even though the jury does not impose the sentence, is that in reality, "jurors will consider punishment anyway and without direction may speculate to the possible detriment of a defendant. If nothing else, the instruction impresses upon the jurors the consequences of a guilty verdict."

*Id.,* at 591-592 (quoting 11 David Raybin, *Criminal Practice and Procedure* § 30.73 (1985)). A jury instruction containing the sentencing information required by Tenn. Code Ann. § 40-35-201(b) is both relevant and constitutional. *State v. Nichols*, 24 S.W.3d 297, 301 (Tenn. 2000).

In the case *sub judice*, the trial court's charge to the jury on first degree felony murder concluded with the following statement:

> The punishment for [first degree felony murder] is life imprisonment, life imprisonment without the possibility of parole, or death by electrocution. The State, however, is not seeking the death penalty or life imprisonment without the possibility of parole and, therefore, should you return a verdict of guilty, this court will impose a life sentence.

Petitioner argues that this instruction impermissibly leads the jury to believe that life imprisonment is a significantly less sentence than life without the possibility of parole, especially since the trial court did not inform the jury that Petitioner would actually have to serve at least twenty-five years before he was eligible for parole. *See* Tenn. Code Ann. § 39-13-204(e)(2).

The post-conviction court concluded that the jury instruction as given provided relevant information to the jurors, and that people are aware that the death penalty is a possible penalty for first degree murder in Tennessee. The post-conviction court found that the instruction accurately informed the jury as to the consequences of a guilty verdict and relieved the jurors of any concerns or apprehension as to the possibility of a death sentence in the case before them. We agree with the post-conviction court's findings that Petitioner has failed to show that trial counsel or appellate counsel's conduct was either deficient or prejudicial to Petitioner in failing to object to this jury instruction. Petitioner is not entitled to relief on this issue.

The trial court's charge to the jury also defined the punishment for first degree felony murder as "a sentence of life in the state penitentiary," and did not include the minimum number of years that must be served before Petitioner was eligible for parole. Petitioner contends that his trial counsel rendered ineffective assistance when he failed to object to the trial court's omission of

information concerning Petitioner's parole eligibility. Relying upon the Tennessee Supreme Court's holding in *Dean v. State*, 59 S.W.3d 663 (Tenn. 2001), Petitioner submits that trial counsel's failure to object to the trial court's instructions was prejudicial error. Petitioner also alleges that appellate counsel rendered ineffective assistance when he failed to raise the appropriateness of this jury instruction on appeal.

In *Dean,* the trial court erroneously informed the jury that the range of punishment for attempted second degree murder was three to ten years when, in fact, the range was eight to thirty years. After the jury returned a guilty verdict against the defendant, the trial court sentenced him to fifteen years as a Range II multiple offender, a sentence in excess of that contemplated by the jury during its deliberations. The court concluded that counsel's failure to object to the erroneous jury instructions, or preserve the issue for appeal, was not within the range of competence required of attorneys in criminal cases under the standards set forth in *Baxter* and *Strickland*. *Id.* at 668. The jury charge, as given, set the range of punishment for attempted second degree murder the same as the range of punishment for aggravated assault, a lesser-included offense, and nearly the same for voluntary manslaughter. Based upon the facts before it, the court in *Dean* concluded that the information furnished to the jury as to the potential punishment for attempted second degree murder was so substantially inaccurate that it may very well have affected the jury's deliberations when it considered the charged offense and the lesser-included offenses. *Id.* at 669.

The jury charge challenged by Petitioner in the case *sub judice* is clearly distinguishable from the jury charge reviewed in *Dean.* Unlike *Dean*, the jury convicted Petitioner of first degree felony murder, and the trial court sentenced him to life imprisonment. Life imprisonment is the lowest sentence available to one convicted of first degree murder. Tenn. Code Ann. § 39-13-202(c). Therefore, to show he was prejudiced by the jury instructions, Petitioner would have to demonstrate that the jury would have acquitted him of first degree felony murder had it been provided the jury instructions now requested by Petitioner. Based on the record, it is highly improbable that the jury would have opted for acquittal rather than conviction. Accordingly, whether or not in this instance the trial court's charge did not follow the statutory requirements mandated by Tenn. Code Ann. § 40-35-201(b) in effect at the time of Petitioner's trial, Petitioner has not demonstrated that there is a reasonable probability that a clearer jury instruction would have led to a different result in the trial. Petitioner has also not demonstrated that he was prejudiced by the failure of his appellate counsel to raise the appropriateness of this jury instruction on appeal. Petitioner, therefore, is not entitled to relief on this issue.

Finally, Petitioner contends that trial counsel provided ineffective assistance because he failed to object to the trial court's jury charge on first degree felony murder which omitted instructions as to lesser-included offenses. Correspondingly, Petitioner alleges appellate counsel proved ineffective when he failed to appeal this issue. Petitioner did not raise this issue in his Petition for Post-Conviction Relief, and we cannot find any evidence in the transcript of the evidentiary hearing that the issue was presented to the post-conviction court. Issues not raised in a petition for post-conviction relief cannot be raised for the first time on appeal. *See* Tenn. Code Ann. § 40-30-210(f). Accordingly, this issue is waived.

B. Prosecutorial Misconduct

Petitioner next argues that his counsel failed to provide effective assistance of counsel because trial counsel did not object to, and appellate counsel did not appeal, certain remarks made by the prosecution during closing argument. When describing Ms. O'Bryan's influence over Ms. Suggs' testimony, Petitioner's main alibi witness, the prosecutor compared Ms. O'Bryan to the coyote of Indian folklore.

> Ladies and gentlemen of the jury, the last area that the State is going to address is the credibility of Ms. Suggs. In western Indian lore from the Canadian border to the Mexican border, trickster runs through the methodology of Western India [sic], trickster is Coyote. Coyote lies to the Gods and lies to the Indians, to the mortals, and causes confusion between the Gods and the mortals and things are created and things are destroyed and people die and Gods fall from the Heavens because of the chaos created by the coyote, the trickster. The state would submit that there are some characteristics in [sic] trickster in Mrs. O'Brien [sic].

Although a great deal of latitude is extended to both the prosecution and the defense as they present their views to the jury, this latitude is not without limitation. *Russell v. State*, 532 S.W.2d 268, 271 (Tenn. 1976). Accordingly, counsels' arguments must be temperate, based on the evidence presented at trial and pertinent to the issues raised. *Id.; Smith v. State*, 527 S.W.2d 737, 739 (Tenn. 1975). To rise to the level of prosecutorial misconduct, the comment complained of must be so improper that the comment "could have affected the verdict to the prejudice of the defendant." *Herrington v. State*, 385 S.W.2d 758 (Tenn. 1965).

The factors that are relevant in determining if a particular comment is prejudicial include: (1) the conduct complained of, viewed in light of the facts and circumstances of the case; (2) the curative measures undertaken by the Court and prosecutor; (3) the intent of the prosecutor in making the improper statement; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case. *State v. Coker*, 911 S.W.2d 357, 369 (Tenn. Crim. App. 1995), *perm. to app. denied* (Tenn. 1995), *overruled in part by State v. West*, 19 S.W.3d 753 (Tenn. 2000)(quoting *Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976)).

As a general proposition, the prosecutor should refrain from name calling or using derogatory remarks. *State v. Bane*, 57 S.W.3d 411, 425 (Tenn. 2001); *State v. Bates*, 804 S.W.2d 868, 881 (Tenn. 1991). Although the prosecutor may not express his personal opinion as to the credibility of the witnesses, he may draw inferences concerning their testimony which are supported by the record. *State v. Beasley*, 536 S.W.2d 328, 330 (Tenn. 1976); *Lackey v. State,* 578 S.W.2d 101, 107 (Tenn. Crim. App. 1979), *cert. denied* (Tenn. 1979).

It is not improper for a prosecutor to suggest to the jury that Petitioner's alibi witnesses lied if this inference is supported by the record. *Id.* Mr. Lunceford testified at Petitioner's trial that he and Petitioner left the Pickle Factory with the victim shortly before the murder. Ms. O'Bryan and

Ms. Suggs both said that Petitioner did not leave the bar on October 28 for more than a few minutes at a time. Only one version of the events leading up to the victim's murder is accurate.

At trial, Ms. O'Bryan testified that she was a bartender at the Pickle Factory in 1994 and arrived for work at 8:00 a.m. On the day of the murder, Ms. O'Bryan said that the victim, Mr. Lunceford, Petitioner, Dorothy Suggs and her husband were all present at the Pickle Factory. She could not remember specifically whether Mr. Herdman or Mr. Roberts had been in the bar, but she thought she had seen Ms. Shepard at some point. During the day, Petitioner left periodically but was gone only five or ten minutes at a time. At 2:00 p.m., Ms. O'Bryan left to buy cigarettes for the bar and returned approximately forty-five minutes later. Petitioner was still in the bar when she got back from her errands, and he was still there when she got off work at 8:00 p.m. She could not remember, however, when the victim had left.

On cross-examination, the prosecution focused primarily on questioning the accuracy of Ms. O'Bryan's memory of the events on October 28. Ms. O'Bryan admitted that Petitioner, Ms. Suggs, and Mr. Lunceford were regular patrons, and Petitioner and Mr. Lunceford were drinking a great deal in 1994. Often, Petitioner and Mr. Lunceford would arrive at the bar at 8:00 a.m. when she opened up. The victim was not as frequent a visitor to the bar as Petitioner and Mr. Lunceford. Ms. O'Bryan agreed that it was difficult to separate one day from another. She was very familiar with the regulars and often sat down to share a drink and conversation while she was working. On October 28, Ms. O'Bryan testified that she had shared four beers with the regulars after she returned from her cigarette run.

Ms. Suggs testified at trial that she was working part-time at the Pickle Factory in 1994, but she had not learned about the victim's death, whom she knew only as "Ski," until after the Petitioner was arrested. When Ms. Suggs asked when the murder occurred, Ms. O'Bryan reminded her it was the day that they were all sitting together at a big table, and the victim was buying rounds of beer. Ms. Suggs, however, maintained that her recollections of the day's details were her own, not Ms. O'Bryan's.

The record indicates that both versions of the events of October 28 were fully and ably presented to the jury, and the jury obviously credited the testimony of Mr. Lunceford. The post-conviction court noted that the prosecutor's allegory probably did not have a great deal of meaning to most people and found that Petitioner had not shown that he was prejudiced by the comment. We agree that Petitioner has not shown by clear and convincing evidence that he was prejudiced by trial counsel's failure to object to the comments or appellate counsel's failure to appeal the appropriateness of the comments. Petitioner is not entitled to relief on this issue.

C. Failure to Adequately Investigate Witnesses

Petitioner alleges that trial counsel failed to adequately interview and investigate witnesses whose testimony, Petitioner contends, could have strengthened Petitioner's alibi and established the presence of another potential suspect, Richard Roberts. At the post-conviction hearing, Petitioner

presented three witnesses. Both Ms. Suggs' and Ms. O'Bryan's testimony at the post-conviction hearing was substantially the same as that at trial. Ms. Suggs did provide testimony that her husband, Billy Joe Johnson, had talked with Petitioner after the victim had left with Mr. Lunceford and Mr. Roberts. Mr. Johnson, now deceased, had not been called as a witness at trial, and Ms. Suggs believed that Mr. Johnson could have corroborated her testimony that Petitioner had not left the bar with the victim. Both women said that Petitioner's trial counsel had not asked them about the altercation between Ms. Shepard and Mr. Roberts in which Mr. Roberts had slit Ms. Shepard's throat.

Randall Herdman next testified on Petitioner's behalf, but his testimony directly contradicted Ms. Suggs' recollections. Mr. Herdman's testimony essentially corroborated Petitioner's testimony at the post-conviction hearing that Petitioner had left the bar in the company of the victim, Mr. Lunceford and Mr. Herdman.

In order to support his claim that trial counsel failed to call certain witnesses to Petitioner's detriment, Petitioner must show, through the witnesses' testimony at the evidentiary hearing, that they would have testified favorably and provided critical evidence in support of Petitioner's defense. *Black*, 794 S.W.2d at 757. Both Ms. Suggs and Ms. O'Bryan testified at trial and provided no new information other than information concerning an alleged altercation between Mr. Roberts and Ms. Shepard in which Mr. Roberts had inflicted the same type of injury on Ms. Shepard as had been inflicted on the victim. Neither one testified when the altercation took place, and Petitioner did not call either Mr. Roberts or Ms. Shepard to the stand. Detective Charvis testified that none of Mr. Roberts' fingerprints matched those found on items at the crime scene. Moreover, neither Petitioner nor Mr. Herdman identified Mr. Roberts as a member of the group that left the Pickle Factory with the victim on the afternoon of the murder. Petitioner's trial counsel did not call Mr. Johnson to testify, but it appears that his testimony would have been cumulative to Ms. Suggs' testimony.

Finally, Mr. Herdman's testimony was far from exculpatory. In fact, his description of the events of October 28 actually reinforced the State's case. Mr. Herdman's testimony placed Petitioner in the car with the victim immediately prior to the murder, and Mr. Herdman testified that Petitioner, Mr. Lunceford and the victim drove off together in the victim's car to ride around in the country and drink.

Whether to call a particular witness to the stand is a strategic decision made by counsel amidst the facts and circumstances at the time. Based upon a review of the record, Petitioner has failed to show by clear and convincing evidence that he was prejudiced or counsel was deficient for failing to call Mr. Johnson or Mr. Herdman to the stand and failing to investigate Mr. Roberts more thoroughly. Petitioner has also failed to sustain his burden of proof that appellate counsel was deficient in not appealing trial counsel's failure to call these witnesses to the stand or investigate Mr. Roberts further. Defendant is not entitled to relief on this issue.

## D. Right to Testify at Trial

Petitioner alleges that trial counsel failed to advise him adequately of his right to testify in his own defense at trial and failed to insure that Petitioner's waiver of his right to testify was knowing and informed. Petitioner said that both he and trial counsel were undecided as to whether Petitioner would take the stand until the trial date. While they were in the courtroom, trial counsel advised Petitioner not to testify because the State would "chew him up" if he took the stand. Petitioner admitted that he agreed with trial counsel's advice at the time, but said that he did so because he had not had a chance to review his case file. In view of Mr. Lunceford's and Mr. Nelson's incriminating testimony, Petitioner argues that the jury should have had an opportunity to hear his side of the story. Trial counsel testified that he could not remember what he and Petitioner had specifically discussed concerning Petitioner's decision to testify, only that they had discussed the issue.

A criminal defendant has a fundamental constitutional right to testify in his or her own behalf, and only the defendant can personally waive the right to testify. *Momon v. State*, 18 S.W.3d 152, 161 (Tenn. 1999). A right that is fundamental and personal to the defendant may only be waived if there is evidence in the record supporting an intentional and knowing waiver, and such waiver may not be "presumed from a silent record." *Id.* Although the safeguards established in *Momon* were not in effect at the time of Petitioner's trial, the post-conviction court found that Petitioner had been adequately advised by his trial counsel of his right to testify, and that Petitioner had knowingly agreed with counsel's advice that taking the stand was not in Petitioner's best interest. Based upon a review of the record, we find that the evidence does not preponderate against the post-conviction court's finding, and this issue is without merit.

## E. Failure to Appeal Consecutive Sentencing

At the conclusion of Petitioner's post-conviction hearing, the post-conviction court found that Petitioner had received ineffective assistance of counsel on appeal because appellate counsel (1) did not appeal the appropriateness of the trial court's order of consecutive sentencing, and (2) failed to request a transcript of the sentencing hearing. The post-conviction court concluded that "Petitioner should be allowed appellate review of the imposition of consecutive sentences upon the appeal of this matter." However, the post-conviction court did not make a specific finding that Petitioner was prejudiced in that the result of the appeal would have been different were it not for appellate counsel's deficient conduct. The State appeals the grant of post-conviction relief on this issue alone, arguing that Petitioner has not shown he was prejudiced by his appellate counsel's failure to raise the appropriateness of consecutive sentencing on appeal, even if his conduct were found to be ineffective.

We note at the outset that it appears that the post-conviction court's grant of relief is phrased as an order for a delayed appeal on the issue of consecutive sentencing. However, Petitioner has already been granted a direct appeal and thus is not entitled to a delayed appeal. The Post-Conviction Procedure Act only authorizes a delayed appeal when a petitioner has been "denied his

-13-

right to an appeal from his original conviction in violation of the Constitution of the United States or the Constitution of Tennessee." Tenn. Code Ann. § 40-30-213. The post-conviction court under the appropriate circumstances should have ordered a new sentencing hearing when it determined that Petitioner was prejudiced by the deficient conduct of his appellate counsel in preserving sentencing issues on appeal. Nonetheless, after a thorough review of the record, we agree with the State. Because Petitioner has not demonstrated that there is a reasonable probability that the result on appeal would have resulted in a different conclusion had appellate counsel filed a transcript of the sentencing hearing, we need not address whether appellate counsel's assistance was deficient.

A criminal defendant has a constitutional right to counsel on his first appeal, and this right necessarily includes the right to effective assistance of counsel. *Douglas v. California*, 372 U.S. 353, 83 S. Ct. 814, 9 L. Ed.2d 811 (1963); *Cooper v. State*, 849 S.W.2d 744, 746 (Tenn. 1993). The same principles applicable to deciding the effectiveness of trial counsel apply to appellate counsel. *Id.* Thus, Petitioner's appellate counsel must not only have been ineffective in his performance, Petitioner must also have been prejudiced by appellate counsel's deficient conduct. *Strickland*, 466 U.S. at 693. To demonstrate he was prejudiced by appellate counsel's actions, Petitioner must show that there is a reasonable probability that the result on appeal would have been different but for the errors of counsel. *Dean*, 59 S.W.2d at 668. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2067. A trial court's findings of fact supporting a claim of ineffectiveness of counsel are presumed correct unless the evidence preponderates against such findings. *Fields*, 40 S.W.3d at 458. "However, a trial court's conclusions of law–such as whether counsel's performance was deficient or whether that deficiency was prejudicial–are reviewed under a purely de novo standard, with no presumption of correctness given to the trial court's conclusions." *Id.*

At the sentencing hearing, the trial court imposed a sentence of twenty-five years for especially aggravated robbery, four years for theft of property and two years for setting fire to personal property. The trial court ordered the robbery and setting fire to personal property convictions to run consecutively with Petitioner's life sentence for first degree felony murder, and the sentence for theft to run concurrently with the robbery conviction, for an effective sentence of life imprisonment plus twenty-seven years. In making this determination, the trial court found that the preponderance of the evidence showed that Petitioner is an offender whose record of criminal activity is extensive. Tenn. Code Ann. § 40-35-115(b)(2). The trial court also noted that it considered the sentencing principles in Tenn. Code Ann. §§ 40-35-102, -103, and -104 in making its determination that consecutive sentencing was appropriate.

Petitioner argues that his criminal record does not rise to the level of extensive criminal activity contemplated by Tenn Code Ann. § 35-115(b)(2) because his prior convictions consist primarily of misdemeanors and traffic offenses. Petitioner also presented testimony at the sentencing hearing that he was employed at the time of his arrest, paid child support for his three children and provided assistance to his elderly parents.

This Court has now had the opportunity to review the transcript of the sentencing hearing. According to the record, Petitioner had nineteen misdemeanor convictions between 1978 and 1993 involving charges of public intoxication, marijuana possession, driving while under the influence, driving with a revoked license, malicious mischief, evading arrest and traffic offenses. In addition, Petitioner was convicted of burglary, a Class D felony, in 1983 for which he received a three-year sentence. The trial court suspended Petitioner's sentence, and he was placed on probation. Petitioner's probation was later revoked, and he was ordered to serve the balance of his sentence. In 1992, Petitioner was convicted of theft of property valued between $500 and $1,000, a Class E felony, and sentenced to two years. The trial court suspended Petitioner's sentence and placed him on probation.

If a defendant is convicted of more than one criminal offense, consecutive sentencing may be imposed at the discretion of the trial court if one or more of the criteria in Tenn. Code Ann. § 40-35-115(b) is present. As pertinent to this case, a defendant "whose record of criminal activity is extensive" is an appropriate candidate for consecutive sentencing. Tenn. Code Ann. § 40-35-115(b)(2). The trial court must also consider the general principles of sentencing in determining the length of the sentence, and the sentence must be "justly deserved in relation to the seriousness of the offense." *State v. Lane*, 3 S.W.3d 456, 460 (Tenn. 1999); Tenn. Code Ann. § 40-35-102(1).

Based on a careful review of the record, we find that Petitioner has failed to show that he was prejudiced by appellate counsel's failure to request a transcript of the sentencing hearing and raise the issue of consecutive sentencing on appeal. Specifically, Petitioner has failed to show that there is a reasonable probability that the outcome of his appeal would have been different had a transcript of the sentencing hearing been provided this Court. Petitioner's prior criminal record, consisting of nineteen misdemeanors, two felonies and one failed probation, clearly supports the sentencing court's finding that Petitioner has an extensive criminal record. *See State v. Pettus*, 986 S.W.2d 540, 545 (Tenn. 1999)(the defendant's record of two thefts, an unlawful weapons conviction, contributing to the delinquency of a minor and driving on a revoked license was sufficient to support consecutive sentences). Furthermore, the post-conviction court did not make a finding that Petitioner was prejudiced, that is, the result of the appeal would have been different. Accordingly, we reverse the judgment of the post-conviction court as to this issue.

## CONCLUSION

Based upon a careful review of the record, we affirm the trial court's judgment as to all issues other than consecutive sentencing and reverse the trial court's judgment that Petitioner received ineffective assistance of counsel as to the issue of consecutive sentencing.

_____
THOMAS T. WOODALL, JUDGE

-15-