IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 10, 2002

## STATE OF TENNESSEE v. BILLY F. JOHNSON

**Appeal from the Criminal Court for Davidson County**
**No. 2000-B-1103      Seth Norman, Judge**

_____

**No. M2001-00330-CCA-R3-CD - Filed February 18, 2003**

_____

A Davidson County Criminal Court jury convicted the defendant, Billy F. Johnson, of first degree premeditated and felony murder and theft of property valued more than five hundred dollars but less than one thousand dollars, a Class E felony. The trial court merged the murder convictions and sentenced the defendant to life in the Department of Correction (DOC). For the theft conviction, the trial court sentenced the defendant to two years to be served concurrently to the life sentence. The defendant appeals, claiming (1) that the evidence is insufficient to support his premeditated murder and theft convictions; (2) that the trial court erred by denying his motion to suppress his confessions; and (3) that the trial court erred by refusing to order the prosecutor to stop misstating the facts during closing argument. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which DAVID G. HAYES and JOE G. RILEY, JJ., joined.

Paula Ogle Blair, Nashville, Tennessee, for the appellant, Billy F. Johnson.

Paul G. Summers, Attorney General and Reporter; Helena Walton Yarbrough, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Pamela S. Anderson, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This case relates to the defendant's killing Billy Wiggins with a sledgehammer. Tom Hailey testified that he and the victim were friends and that he had known the victim for a couple of years. The victim drove a tour bus for country music bands and would leave Nashville on trips that lasted two days to two months. While the victim was away, Mr. Hailey checked on the victim's house and picked up his mail. Mr. Hailey had a key to the victim's home and would put the mail on the victim's dining room table.

In January 1998, the victim had been away from home on a bus trip. The victim was a few days late returning to Nashville, and Mr. Hailey tried to contact the victim through the victim's pager and cellular telephone. When the victim did not answer, Mr. Hailey went to the victim's home and noticed that the victim's 1985 Mercury Marquis was gone. He went into the house, opened the victim's bedroom door, and saw the victim lying in bed. Mr. Hailey knew the victim was dead, closed the bedroom door, called 9-1-1, and went outside to wait for the police.

On cross-examination, Mr. Hailey testified that he lived twelve to fifteen miles from the victim. He said he did not remember telling the police that the victim liked to pick up young men and take them to the victim's home in order for the men to do odd jobs. He also said he did not remember telling the police that the victim was a homosexual. He said that as soon as the victim would get back from a bus trip, the victim would pick up men who did not have a place to live and would hire them to clean his bus. He said the victim paid the men, allowed them to spend the night in the victim's home, and cooked supper for them. He said he had seen the victim with the defendant and the codefendant, David Lackey, before. He said that one time he visited the victim's home while the defendant and Mr. Lackey were there and that the victim cooked dinner for the defendant and Mr. Lackey.

Mr. Hailey testified that the victim did not drink but that men who stayed at the victim's house would bring their own beer. He said that he never saw the victim give the men gifts and that the victim did not help the men find jobs. He said that the victim took prescription medicine and that he did not remember seeing drugs or alcohol in the victim's home. He said that on the day he found the victim, he was in the victim's home for about five to ten minutes and touched three doorknobs and a telephone.

Lieutenant John Stephens of the Nashville Metropolitan Police Department (Metro Police) testified that at 6:15 p.m. on January 24, 1998, he was dispatched to the victim's home at 716 Greymont Drive. Another officer told him that a body was inside, and he and the officer entered the victim's bedroom. The victim was lying in bed, and most of the victim's body was covered with a blanket. A tool handle was sticking out from underneath the covers at the head of the bed, and Lieutenant Stephens later learned the tool was a sledgehammer. He and the officer went outside and secured the house until homicide detectives arrived.

Dr. John E. Gerber, a forensic pathologist, testified that the fifty-year-old victim died of multiple blunt force injuries to the right side of his head. The injuries fractured the victim's skull and tore his brain. The victim also had bruises on his right elbow and on his right forearm. No drugs or alcohol were found in the victim's blood, and the body was moderately decomposed. The victim may have lived for an hour after he was attacked and could have made sounds during that time. Although Dr. Gerber did not know how the victim injured his right arm, he said that the bruises on the victim's forearm and elbow could have been defensive wounds.

Metro Police Officer Edward Shea testified that he worked in the Identification Section of the department and that on January 24, 1998, he was called to 716 Greymont Drive to photograph

the crime scene and collect fingerprint evidence. He found blood spatter on the victim's bedroom door and on the wall at the head of the victim's bed. He also saw that the victim's bed sheets and pillows were heavily stained with blood. An entertainment center in the victim's bedroom had been pulled away from the wall, and a television was missing. The handle of a sledgehammer was sticking out from underneath the sheets at the head of the victim's bed, and Officer Shea collected the sledgehammer as evidence.

Larita Marsh, a fingerprint analyst for the Metro Police, testified that she analyzed fingerprint evidence from the victim's home. She said that fingerprints found on the inside of a bathroom door and on the right side of the victim's entertainment center matched the defendant and that fingerprints found on a plastic container in the victim's living room and on the outside of the victim's bedroom door matched David Lackey. She said that other fingerprints found in the home matched the victim and that one fingerprint matched a man named John Matthew Cleg.

Metro Police Officer Ralph Deavers testified that in January 1998, he worked in the police department's Identification Section and received a sledgehammer for processing. He said he put a chemical dye on the sledgehammer and was able to see smudges and smears on its handle. He acknowledged that the smudges and smears could have been caused by someone wearing gloves.

Metro Police Officer Gary Felts testified that on January 22, 1998, two days before Tom Hailey found the victim, he was dispatched to an accident at the intersection of Eighteenth and West End Avenues. He saw that the front of a Mercury Marquis had hit a utility pole. Although the driver was not present, Officer Felts learned from the car's license tag and registration that it belonged to the victim. He had the car towed to the police department.

Metro Police Detective Larry Carter testified that at 8:30 a.m. on January 22, he reported to a traffic accident at Eighteenth and West End Avenues. He had been called to the scene because another officer had found electronic equipment in the car. After the car was towed to the police department, Detective Carter inventoried the car and made a list of the items he found. The list, which the state introduced into evidence, shows that the car contained eighteen items, including several televisions and video cassette recorders (VCRs). Detective Carter learned that the car belonged to the victim and that the car had not been reported stolen. On January 23, he went to the victim's house in order to get information about the car and the electronic equipment. Mail was in the victim's mailbox, the blinds in the victim's house were closed, and the house looked abandoned. Detective Carter knocked on the victim's door and radioed for assistance. He talked to the victim's neighbors but did not find the victim. Two days later, he found out that the victim had been killed. On cross-examination, he said that the windshield on the Marquis had been cracked and that hair and tissue were embedded in the broken glass.

Metro Police Officer Charles Ray Blackwood, Jr. testified that on February 2, 1998, he helped another officer collect evidence, including a glove, a wallet, and a driver's license, off Interstate 24 in Davidson County. Officers found the items in the grass beside the shoulder of the interstate, and the distance between the first and last pieces of evidence was one thousand feet. The

evidence was tested for fingerprints, but no prints were recovered.  On cross-examination, Officer Blackwood said that the glove appeared to have been thrown from the interstate.  The glove was dirty but no blood, hair, or fibers were on it.  Officer Blackwood did not remember how far the glove was found from the other items and did not know if the glove had anything to do with the victim's death.

Detective Keith Barnett of the Montgomery, Alabama Police Department testified that Montgomery police officers arrested the defendant at 2:20 a.m. on February 7, 1998, based on a warrant that had been issued for the defendant in Nashville.  He said that ten minutes after the police arrested the defendant, officers brought the defendant to the police station and he began talking to the defendant.  He said that at first, the defendant could not remember anything and could not tell Detective Barnett the defendant's name.  He said that he had received a picture of the defendant from the National Crime Information Center (NCIC) and that he showed the picture to the defendant.  He said that he told the defendant he knew who the defendant was and that he filled out a waiver of rights form for the defendant.  He said that he explained the form to the defendant and that the defendant wanted to talk to him.  He said the defendant signed the form and admitted his name was Billy Johnson.

Detective Barnett testified that the defendant was scared and nervous but very polite.  He said the defendant told him the following:  The defendant had been in Nashville and had been staying with the victim in the victim's house.  The victim would pick up young men and let them live with him in exchange for sex.  David Lackey also had been staying at the victim's home.  Although Mr. Lackey had had sex with the victim, the defendant had not.  The defendant was homeless and frustrated that he did not have any money.  He wanted to get back on his feet and decided to kill the victim and pawn the victim's property.  The defendant told Mr. Lackey that he was going to kill the victim and got a sledgehammer out of the victim's garage.  While the victim slept, the defendant went into the victim's bedroom and hit the victim three times with the sledgehammer.  The defendant and Mr. Lackey loaded the victim's property into the victim's Marquis and drove downtown to pawn the property.  On the way to a pawn shop, the car hydroplaned and hit a utility pole.  The defendant and Mr. Lackey ran from the accident and split up.  The defendant spent a couple of more nights in Nashville and then hopped a freight train to Montgomery, Alabama.  The state played a videotape of the victim's statement for the jury, and the tape corroborated Detective Barnett's testimony.

On cross-examination, Detective Barnett testified that the defendant was dirty but did not appear to be intoxicated.  He acknowledged that the defendant told him the defendant took pills and drank alcohol while the defendant was staying with the victim.  He said the defendant told him that the victim had been pressuring the defendant for sex and had threatened to put the defendant back on the street.  The defendant told Detective Barnett that he "snapped" and that he did not know where he had been for the last couple of days because he had been taking drugs.  He said the defendant claimed that he did not plan to kill the victim.

Metro Police Detective Roy Dunaway testified that he was the lead investigator in the case. He said that the victim's entertainment cabinet had been pulled away from the wall in order for someone to unplug the victim's electronics and that an outline of dust in the cabinet indicated a television and a VCR were missing. He said that a blanket and a pillow were on the victim's living room couch and that when he moved the blanket, a knife fell on the floor. He said that during his investigation, he went to an area off Interstate 24 near Briley Parkway and found some of the victim's identification. He said he developed the defendant and David Lackey as suspects and faxed a warrant and a photograph of the defendant to police in Montgomery, Alabama.

Detective Dunaway testified that Montgomery police arrested the defendant and that he drove the defendant from Montgomery to Nashville on February 12, 1998. He said he took the defendant to the Criminal Justice Center, advised the defendant of his rights, and read a waiver of rights form to him line by line. He said the defendant appeared to understand his rights and signed the form. He said that he interviewed the defendant and that the interview was audiotaped. The defendant's audiotaped confession, which was played for the jury, is nearly identical to his videotaped confession.

On cross-examination, Detective Dunaway testified that he talked to Tom Hailey and that Mr. Hailey claimed to have been the victim's best friend. He acknowledged that Mr. Hailey told him that the victim was a homosexual, that the victim liked to pick up young men, and that the men helped the victim clean his buses. He said that during his investigation, he saw empty beer cans and liquor bottles in the victim's living room and trash can. He said that the defendant had been in custody in Alabama for seven days when he first spoke to the defendant and that the defendant appeared sober. He said that as soon as he and the defendant got back to Nashville, he began questioning the defendant. He said the defendant told him that the defendant had been taking a lot of pills and drinking beer and Jack Daniels the night he killed the victim. He said the defendant told him that the victim had been trying to get sex from the defendant and that the defendant's head had been ringing and screaming. He acknowledged that the defendant told him that after the defendant killed the victim, the defendant drank beer in order to calm down and blacked out. He said that although the defendant could not remember some details of the killing, he thought the defendant had been truthful with him. The jury convicted the defendant of first degree premeditated and felony murder and theft of property valued more than five hundred dollars but less than one thousand dollars.

## I. SUFFICIENCY OF THE EVIDENCE

The defendant claims that the evidence is insufficient to support his first degree premeditated murder conviction because it shows that he snapped and that he did not plan to kill the victim. In addition, he contends that the evidence is insufficient to support his theft conviction because the state failed to prove that the victim's car had a value of more than five hundred dollars. The state argues that the evidence is sufficient. We agree with the state.

Our standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any

rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). We do not reweigh the evidence but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

First degree premeditated murder is defined as a "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). Further, "premeditation" is defined as

> an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Tenn. Code Ann. § 39-13-202(d). The element of premeditation is a question for the jury and may be established by proof of the circumstances surrounding the killing. Bland, 958 S.W.2d at 660. Our supreme court has delineated the following factors that demonstrate the existence of premeditation: the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, and calmness immediately after the killing. Id. A conviction for first degree premeditated murder requires proof that the defendant unlawfully and knowingly killed another. See Tenn. Code Ann. §§ 39-13-201, -210(a)(1). First degree felony murder is in pertinent part, a "killing of another committed in the perpetration of or attempt to perpetrate any . . . theft." Tenn. Code Ann. § 39-13-202(a)(2).

Viewed in the light most favorable to the state, the evidence shows that the defendant is guilty of first degree premeditated murder. Our review of the defendant's videotaped and audiotaped confessions reveals that on the night the defendant killed the victim, the victim went to bed and the defendant went into a second bedroom to watch television. While watching television, the defendant decided to kill the victim and pawn the victim's property. The defendant told David Lackey that he was going to kill the victim. Mr. Lackey or the defendant got a sledgehammer out of the victim's garage, and the defendant carried the sledgehammer into the victim's bedroom. While the victim was sleeping and defenseless, the defendant hit the victim in the head three times with the sledgehammer and covered the victim with a blanket. This evidence is sufficient to support the victim's conviction for premeditated murder. Moreover, although not contested by the defendant, we believe the evidence also is sufficient to support the defendant's felony murder conviction because the evidence shows that after the defendant killed the victim, he and Mr. Lackey loaded the victim's personal property into the victim's car and fled the scene.

-6-

As for his theft of property conviction, the only evidence presented regarding the Marquis' value occurred during the state's questioning of Tom Hailey. Mr. Hailey testified as follows:

Q.      Did you have, by any chance, any knowledge of his 1985 Mercury Marquis car?

A.      Yes, ma'am. He had two cars.

Q.      Okay. And who had the title on the 1985 Mercury Marquis, the dark car?

A.      I did.

Q.      And why did you have the title on that car?

A.      Because I had just gotten it out of the shop. He had just gotten it out of the shop. He hadn't got paid, and he insisted that I take the title.

Q.      Did you loan him money in exchange for that?

A.      Yes, ma'am.

Q.      And how much, if you were to place a dollar figure or value on that car, would you place?

A.      I don't have the slightest idea. I would say five hundred dollars.

Q.      Okay. And how much was the loan that you gave to Mr. Wiggins for the repairs?

A.      Four something, four -- low figures.

Q.      Four hundred?

A.      Yes, ma'am.

Later, Detective Larry Carter testified that he inventoried eighteen items found in the car, including several televisions and VCRs. A list of the inventoried items, which the state introduced into evidence, shows that the car also contained several bottles of liquor, two quartz wall clocks, a pocket radio, and a stereo receiver. Moreover, we note that Detective Carter wrote on the list that the estimated value of the property was five thousand dollars. While we believe the prosecution put

forth minimal effort to prove the value of the car or the stolen items, we conclude that, viewed in the light most favorable to the state, a rational jury could have found that the victim's car and electronic equipment had a value of more than five hundred dollars. The evidence is sufficient to support the defendant's theft conviction.

## II. MOTION TO SUPPRESS

Next, the defendant contends that the trial court erred by denying his motion to suppress his confessions to Montgomery and Nashville police. Regarding his confession to Montgomery police, he claims that it was given involuntarily because he had been without food and rest and because officers told him he would get the death penalty if he did not talk to them. He claims that the trial court also should have suppressed his confession to Nashville police as fruit of the poisonous tree resulting from his first involuntary confession. The state argues that the trial court properly denied the defendant's motion. We agree with the state.

At the suppression hearing, Detective Keith Barnett testified that Montgomery police officers arrested the defendant at 2:20 a.m. on February 7, 1998, and that he read the defendant his rights from a waiver of rights form at 2:35 a.m. He said that he asked the defendant if the defendant understood his rights and that the defendant said yes. He said that he had the defendant read aloud the following paragraph from the form:

> I fully understand the foregoing [rights] and do willingly agree to answer questions. I understand and know what I am doing. No promise or threats have been made to me by anyone and no pressure of any kind has been made against me by anyone.

He said that the defendant signed the waiver of rights form and gave a statement. He said that he took the defendant into an interview room and that he and the defendant went over the waiver of rights form again. He said that the defendant gave a second statement and that the second statement was videotaped. He said that the defendant did not appear to be intoxicated or on drugs, that the defendant did not stagger, and that he did not smell alcohol on the defendant.

On cross-examination, Detective Barnett acknowledged that he did not videotape the defendant's first statement and that at first, the defendant claimed he did not know anything. He denied telling the defendant that the defendant would "fry" if the defendant refused to give a statement and that the defendant probably would get a twenty-one-year sentence if he talked to the police. He said that another officer was present during the defendant's interviews and that he did not hear the officer make any threats or promises to the defendant. He said he did not remember asking the defendant if the defendant had been drinking but that the defendant appeared to be very coherent and did not look tired.

Detective Roy Dunaway testified that he and another officer drove the defendant back to Nashville on February 12. He said that when they arrived, he immediately went over a waiver of

rights form with the defendant. He said that he read the defendant his rights from the form, that the defendant read the form along with him, and that the defendant initialed the rights. He said that the defendant signed the form and did not appear to be intoxicated or on drugs. He acknowledged that the following question appears at the bottom of the form: "Did this subject appear intoxicated or have any known impairment that would render him or her incompetent to fully understand the rights above and make a knowing, intelligent, and voluntary waiver?" He acknowledged that he did not answer the question and said that he must have overlooked it. He said that after the defendant signed the waiver of rights form, he interviewed the defendant and that the interview was audiotaped.

On cross-examination, Detective Dunaway testified that during the trip from Montgomery to Nashville, he and the defendant made conversation. He said that they stopped somewhere for lunch and that the defendant did not appear tired. He said that he did not ask the defendant if the defendant had been taking drugs or drinking alcohol and that the defendant appeared completely normal.

The defendant testified that he had been living on the streets when Montgomery police officers arrested him and that he was tired and worn down. He said that at first, he told the Montgomery officers that he did not know who he was. He said the officers told him he was going to "F-ing fry" if he did not give a statement and that he could get a twenty-year sentence if he talked to them. He said that he did not know anything about the judicial process and that he confessed to killing the victim because he was scared and because the officers kept hounding him. He acknowledged that he had been in trouble with the law as a juvenile and that he had been charged as an adult for two misdemeanors. He also acknowledged that he was lying when he told Montgomery officers that he did not know his name.

The defendant testified that he was still scared and worn down when he confessed to Nashville police. He said, though, that he felt better during his interviews with the Nashville police officers than he had with the Montgomery police officers because he had slept in jail. On cross-examination, he acknowledged signing waiver of rights forms in Montgomery and Nashville. He also acknowledged that Detectives Barnett and Dunaway read the forms to him and that he understood the forms.

The trial court watched and listened to the defendant's confessions. It noted that during the defendant's confession to Montgomery police, he walked into the interview room without difficulty, sat down, and opened a soft drink. It noted that the defendant read the waiver of rights form aloud and that his speech was clear. Finally, the trial court pointed out that in the videotape, the defendant stood up without difficulty and demonstrated how he hit the victim with the sledgehammer. The trial court found "no evidence whatsoever that this gentleman was under any type of influence at the time he made this statement." It denied the defendant's motion to suppress his statements to Montgomery and Nashville police.

A trial court's factual findings on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996); State v.

Jones, 802 S.W.2d 221, 223 (Tenn. Crim. App. 1990). The application of the law to the facts as determined by the trial court is a question of law which is reviewed de novo on appeal. State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997). Further, questions of the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." Id. at 628. The prevailing party "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from the evidence." Odom, 928 S.W.2d at 23. Finally, both the proof adduced at the suppression hearing and the proof adduced at trial may be considered in reviewing the trial court's decision on the motion to suppress. State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998).

In Miranda v. Arizona, the United States Supreme Court held that pursuant to the Fifth and Fourteenth Amendments' prohibition against compelled self-incrimination, police officers must advise a defendant of his or her right to remain silent and right to counsel before they may initiate custodial interrogation. 384 U.S. 436, 479, 86 S. Ct. 1602, 1630 (1966). If these warnings are not given, statements elicited from the individual may not be admitted for certain purposes in a criminal trial. Stansbury v. California, 511 U.S. 318, 322, 114 S. Ct. 1526, 1528 (1994). A waiver of constitutional rights must be made "voluntarily, knowingly, and intelligently." Miranda, 384 U.S. at 444, 86 S. Ct. at 1612. The state has the burden of proving the waiver by a preponderance of the evidence. State v. Bush, 942 S.W.2d 489, 500 (Tenn. 1997). In determining whether a defendant has validly waived his Miranda rights, courts must look to the totality of the circumstances. State v. Middlebrooks, 840 S.W.2d 317, 326 (Tenn. 1992).

Our review of the record supports the trial court's determination that the defendant voluntarily confessed to killing the victim. Detective Barnett testified that he read Miranda warnings to the defendant before the defendant's first interview in Montgomery and that the defendant signed a waiver of rights form. Detective Barnett further testified that the defendant was not under the influence of drugs or alcohol and that he did not make any threats or promises to the defendant. Similarly, Detective Dunaway testified that he read Miranda warnings to the defendant before the defendant's first Nashville interview and that the defendant signed a waiver of rights form. On both the Montgomery and Nashville forms, the defendant signed statements acknowledging that he had not been pressured or promised anything in return for his talking to the police, and he testified at the suppression hearing that he read the forms and understood them. We note that in our review of the defendant's video- and audiotaped confessions, the defendant was calm and extremely articulate in describing why and how he killed the victim. At no time did he indicate that he was confused or that the police pressured him into confessing. We conclude that the defendant voluntarily confessed to the crimes and that the trial court properly denied his motion to suppress.

### III. PROSECUTOR'S CLOSING ARGUMENT

Finally, the defendant claims that the trial court erred by failing to order the prosecutor to stop misstating the facts during her closing argument. In addition, he contends that the trial court should have provided the jury with a curative instruction regarding the misstatements. The state

argues that the prosecutor's statements were not improper, and, therefore, that no curative instruction was required. We believe that the defendant is not entitled to relief.

During the state's closing argument, the prosecutor said, "Billy Wiggins was a person. He got a paycheck. He was a single gay dude. He was an 'it'. He was a faggot, who you couldn't stand to look at." Later, the prosecutor stated the following:

> So [the defendant] sits in his room, watching TV, decides to kill [the victim]. He's going to haul his TVs and his VCRs and load them up and take off.
> So what does he do? He gets up. He walks out of the room. He walks down the hall. He walks into the living room, where David is. He stops, he has a conversation. He has a conversation with David about what he is planning to do.
> He asks him, "Are you in on it? Are you game for it?" See, he needs David because David's the one with the I.D.

At that point, the defense objected on the basis that there was no evidence that the defendant made those statements to David Lackey The trial court overruled the objection and said, "It's for the Jury to decide what the facts are in the case."

The defendant first contends that the prosecutor referred to the victim as an "it" and a "faggot" in order to inflame the jury and give the jury the impression that the defendant killed the victim because the victim was a homosexual. As for the prosecutor's statements regarding the defendant's conversation with Mr. Lackey, the defendant claims that there was no evidence that he made those statements. Moreover, he contends that he was prejudiced by the statements because they gave the jury the impression that he planned and premeditated the killing.

The Tennessee Supreme Court has recognized that "argument of counsel is a valuable privilege that should not be unduly restricted." Smith v. State, 527 S.W.2d 737, 739 (Tenn. 1975). Jury argument must be predicated on evidence which is introduced during the trial and is pertinent to the issues being tried. Russell v. State, 532 S.W.2d 268 (Tenn. 1976). Attorneys may not argue facts which are not of record. State v. Beasley, 536 S.W.2d 328, 330 (Tenn. 1976). Likewise, it is improper for an attorney to misstate evidence intentionally. See Granstaff v. State, 163 Tenn. 623, 45 S.W.2d 527 (1932). In Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976), this court set out the following considerations for determining whether the state's conduct could have improperly prejudiced the defendant and affected the verdict:

> 1. The conduct complained of viewed in context and in light of the facts and circumstances of the case.
>
> 2. The curative measures undertaken by the court and the prosecution.

3.  The intent of the prosecutor in making the improper statement.

4.  The cumulative effect of the improper conduct and any other errors in the record.

5.  The relative strength or weakness of the case.

Regarding the prosecutor's referring to the victim as an "it" and a "faggot," as the state points out in its brief, the defendant failed to object at trial to the prosecutor's statements. The failure to object contemporaneously constitutes a waiver of the issue pursuant to Rule 36(a), T.R.A.P. See also State v. Little, 854 S.W.2d 643, 651 (Tenn. Crim. App. 1992) (failure to object to prosecutor's alleged misconduct during closing argument waives any later complaint). With respect to the prosecutor's statements about the defendant's conversation with David Lackey, the defendant confessed to police that he decided to kill the victim and that he told Mr. Lackey about his intentions. However, the record contains no evidence that the defendant specifically said, "Are you in on it? Are you game for it?" Nevertheless, we believe that in making those statements to the jury, the state merely was trying to show that the defendant premeditated the killing and that Mr. Lackey agreed to go along with it. There is no evidence that the prosecutor deliberately tried to mislead the jury, and there is ample evidence to support the jury's finding of premeditation. We conclude that the prosecutor's statements did not prejudice the defendant.

Based on the foregoing and the record as a whole, we affirm the judgments of conviction.

_____
JOSEPH M. TIPTON, JUDGE